**BOONE COUNTY, Missouri, By and Through James BUTCHER, et al., Respondents,**

v.

**BLUE CROSS HOSPITAL SERVICE, INC., OF MISSOURI, Appellant.**

No. KCD 27062.

Missouri Court of Appeals, Kansas City District.

July 7, 1975.

Motion for Rehearing and/or Transfer Denied Aug. 5, 1975.

Application to Transfer Denied Oct. 13, 1975.

Robert F. Schlafly, Fortis M. Lawder, St. Louis; Keefe, Schlafly, Griesedieck & Ferrell, St. Louis, of counsel, and B. Daniel Simon, Columbia; Welliver & Simon, Columbia, of counsel, for appellant.

Robert C. Smith, Jr., David B. Rogers, Columbia, for respondents; Smith, Lewis & Rogers, Columbia, of counsel.

Before SOMERVILLE, P. J., PRITCHARD, C. J., and SWOFFORD, J.

PRITCHARD, Chief Judge.

The dispute is whether Boone County Hospital (BCH) is entitled to charge nonresidents of Boone County, Missouri, who are members of appellant Blue Cross, a "surcharge" or "pre-admission charge" of $5.20 per day in view of a provision in the agreement between BCH and Blue Cross, paragraph 3, that "Hospital agrees not to charge or collect from any Blue Cross participant any amount whatsoever for any hospital care included in certificates offered by Blue Cross except such payments, if any, as provided in the membership certificates. Hospital may charge directly to patients for hospital care not included in certificates offered by Blue Cross."

The parties stipulated these pertinent facts: BCH is a public hospital established by Boone County, Missouri (at Columbia) under the provisions of §§ 205.160 to 205.-370 and § 205.378, RSMo 1969, V.A.M.S.; it is a general hospital of about 251 beds for patients, with operating rooms and all necessary or required supportive facilities such as X-ray equipment and laboratories; BCH is regularly used by both residents of Boone County as well as persons residing outside of Boone County; Blue Cross is a not-for-profit corporation under Missouri laws, having a corporate board of 204 persons as representatives of the public, hospitals and medical societies. Those persons elect a present 25 member board of trustees who are empowered to manage and direct the affairs of the corporation; Blue Cross, since 1936, has operated a hospital service plan for members who pay dues for benefits, with a total enrollment of members as of April 30, 1972, of 1,250,232, including members of group programs and direct pay members, to whom certificates and membership cards are issued which specify the terms and conditions of membership; Blue Cross solicits members and operates its hospital service plan in 84 counties and the City of St. Louis, and included is Boone County; member hospitals are 112 in number and the form of hospital service contract is uniform for each; BCH has been a member hospital since 1939, and subsequently 7 different contracts were made culminating in the current contract of July 1, 1968, under which Blue Cross pays BCH for standard benefits on a cost reimbursement basis, expressed as a per diem amount or on a basis of BCH's billed charges, whichever is the lesser on an annual basis; ancillary benefits (those other than standard) are paid BCH on the basis of its charges to patients, subject to Blue Cross' variations in different plans; on or about December 30, 1968, BCH's board unanimously passed a resolution effective January 1, 1969: " 'That the out of county charges be increased to $5.20 per day effective January 1, 1969, and that this charge be reviewed annually' "; BCH after January 1, 1969, began to collect the $5.20 per day charge directly from out-of-county Blue Cross member patients; about May 27, 1969, Blue Cross began to withhold from its payments $5.20 per day for each member who was not a resident of Boone County; upon contracting each such member Blue Cross made a refund totalling $85,746.60 in 1,958 cases involving 16,483 hospital days as of January 9, 1973, and Blue Cross has withheld a like amount from payments due BCH under the service contract in order to make the refunds; [it was further stipulat-

ed that an additional amount, $19,630.10, was so withheld through August 31, 1973, to make a grand total of $105,334, which with interest added makes the amount of the judgment entered for BCH, $114,726.67].

At trial Mr. James L. Dack, BCH's administrator, testified that BCH has had a constantly increasing percentage of its patients from outside Boone County because of a large number of medical specialists practicing at BCH. The out-of-county patient percentages were these: 1972, 46%; 1971, 42%; 1970, 40%; and 1969, 34%. The census figures of BCH (97% occupancy in 1972) created problems, and it had to reduce pre-scheduled patients to 12 per day, other than emergency patients. At the time of trial, without the patients from outside the county, there would not be any pressure for additional space, but since out-of-county patients are admitted, 100 additional beds are needed. The voters approved a bond issue for 64 beds, and the total bonded indebtedness is $4,430,000, for the present hospital facilities it is $1,240,000. The debt, interest and principal, is paid by a present special real estate tax of 13 cents per $100.00 valuation levied on Boone County real property; and for maintenance, another 20 cents tax is likewise levied for the budgeted $5,855,000 annual maintenance cost (spent to within 1%), of which about ⅓ is used for the care of indigent patients. No out-of-county charge is made to medicare patients because the medicare formula for reimbursement covers that charge. According to Mr. Dack, a nonresident of Boone County would not be getting anything separate or different than a resident for the same illness or condition for the $5.20 extra daily charge. That charge is not additional for room, board and general nursing, "(T)his is a surcharge which has no relationship to any specific services rendered which is a part and parcel of the admission policies of the hospital and stands in the place of the local residents' participation through property taxes."

In 1972, pre-admission total charges for out-of-county patients was in the range of $150,000. These fees are separately funded and made available for hospital expansion, development of new equipment "and this type of thing." No portion is used for maintenance of the hospital.

Mr. Jack Estes, BCH's trustee since 1970, and its board chairman, made investigations concerning the hospital's general admission policy in regard to out-of-county charges and found that they are uniformly applied to all out-of-county patients. These charges are funded for future expansion and improvement of the facilities. No hospital service whatsoever is rendered to an out-of-county patient for the $5.20 a day charge. "Q As a matter of fact isn't it an additional charge for room, board and general nursing services? A No, it is a condition of his being able to be admitted to the hospital." According to Mr. Howard B. Lang, Jr., who was BCH's trustee from 1958 to 1970, and its chairman from 1960 to 1970, 30% of admissions to BCH were nonresidents, and the Board thought (and the people thought) that they should bear their proportionate parts of the costs.

Mr. James E. Baker, Blue Cross' vice president in charge of hospital, felt that Article 3 of the agreement controlled the matter of out-of-county charges in its language, "Hospital agrees not to charge or collect from any Blue Cross participant any amount whatsoever for any hospital care included in certificates offered by Blue Cross * * *." After much correspondence with BCH prior to January 1, 1969, repeatedly enunciating Blue Cross' position on BCH's right to charge the out-of-county fees, the dispute culminated in Blue Cross' deduction of those fees charged its members (as noticed in its letter to BCH of May 27, 1969) which continued deduction resulted in this suit being filed. During 1965, 1966, 1967 and 1968, no out-of-county charges were imposed on Blue Cross members by BCH.

BCH bases its claim that it is entitled to make an "out-of-county" charge under the

provisions of § 205.270, RSMo 1969, relating to County Hospitals, and providing in part, "And said board [of hospital trustees] *may* extend the privileges and use of such hospital to persons residing outside of such county, *upon such terms and conditions* as said board may from time to time by its rules and regulations prescribe." [Emphasis and brackets added.] BCH also contends that the out-of-county charge is a part of its general admission policy, permitted by paragraph 1 of the agreement, which it says is an exception to the provisions of paragraph 3, supra. Paragraph 1 of the agreement is: "Hospital agrees (subject to its general admission policy) to render hospital care in its hospital, as provided in the membership certificates held by, or hereafter offered to, participants, to all Blue Cross participants who apply to the Hospital in the manner specified in the Plan. * *." It is also argued by BCH that paragraph 3 does not apply to out-of-county charges because the nonresident is getting nothing more for the $5.20 per day than the Boone County resident, i. e., that the out-of-county charges are not for "hospital care."

The dispositive issue is whether BCH, in 1964, adopted Blue Cross' construction of the contract that out-of-county charges are for "hospital care" so as to bar BCH from making that charge to nonresident Blue Cross members. Certain other matters must first be noticed. BCH claims that the contract is not ambiguous; that judicial construction of it is not therefore necessary; and that absent ambiguity parol evidence (evidence of surrounding facts and circumstances) is not admissible to aid its construction. The provision of paragraph 3 of the contract, *supra,* is not on its face ambiguous. A *latent* ambiguity does, however, appear when it is sought to apply the words of the contract that no charges or collections shall be made to Blue Cross members except as provided in their membership certificates, to the subject matter of charges made to nonresident Blue Cross member patients of BCH. *Prestigiacamo v. American Equitable Assur. Co.,* 240 Mo.

App. 839, 221 S.W.2d 217, 221[3, 4] (1949). The evidence of the surrounding facts and circumstances to the execution, performance and treatment of the contract between BCH and Blue Cross is thus admissible. See the discussion of the rule permitting evidence of surrounding facts and circumstances in cases of latent ambiguity in *Hardin v. Ray,* 404 S.W.2d 764, 769, et seq. (Mo.App.1966); and also *Leggett v. Missouri State Life Ins. Co.,* 342 S.W.2d 833, 852[14–18] (Mo.1960); 3 Corbin on Contracts, § 536, p. 25.

The record shows that the dispute between BCH and Blue Cross as to the propriety of the out-of-county charge existed since July, 1959. There were many conferences and much correspondence about the charge in which the positions of both parties were stated: BCH's position was that the charge then imposed on out-of-county patients was because of their use of the hospital, and was "in lieu of payment of taxes"; Blue Cross' position was that the charge was not permitted by the contract, but it was agreeable to it that the hospital charge a higher room rate for everyone and allow a discount therefrom to Boone County residents, as used by other county hospitals. The possibility of a declaratory judgment action was discussed, but was never pursued. In December, 1961, BCH advised Blue Cross that its board had decided to resume charging Boone County nonresidents the $1.50 per day charge beginning March 1, 1964. On March 10, 1964, Blue Cross again objected on the same ground that the charge violated the contract. During the ensuing correspondence the matter of seeking a declaratory judgment was again brought up. BCH sent Blue Cross a notice and schedule of increased charges which included "2. Out of county charge Each patient whose plastic identification charge shows an address outside of Boone County shall be charged $1.50 per day additional room charge." Again Blue Cross, through its Mr. Baker objected and again proposed that BCH increase its basic rate by the amount of the out-of-county charge

and then allow a discount to patients who were Boone County residents. Then, most significantly, BCH's administrator, Mr. Dack, wrote to Blue Cross on December 17, 1964, and agreed to adopt the discount method, stating that he found the suggestions in Mr. Baker's letter acceptable, and that "We will make a slight modification in our procedure from this point forward." Thereafter, a "completed form, including the $1.50 out of county charge in our room rates" was sent to Blue Cross by Mr. Byers, BCH's business manager. During neither the 1961, nor the 1964 disputes did Blue Cross pay any extra out-of-county charge to BCH. During 1965, 1966, 1967 and 1968, BCH did not require the out-of-county charge to be paid by Blue Cross members and did not attempt to collect it from them.

The contract which was in effect from July 1, 1965, to June 30, 1968, contained paragraph 3 in identical language to that previous thereto. BCH's board chairman, Mr. Lang, had executed that contract form for BCH, knowing Blue Cross' position and construction of paragraph 3 that it considered out-of-county charges to Blue Cross members to be a violation of the contract. On July 1, 1968, BCH executed the same form for the following period of time, which form made no change in paragraph 3. Mr. Lang knew also that Blue Cross did not object to the discount method. [It should be parenthetically noted that it does not appear from the record that the "discount method" would result in any more revenue to BCH from out-of-county Blue Cross members. It would seem that the formula of reimbursement from Blue Cross to BCH encompasses largely a "cost" basis and not that of charges billed to Blue Cross patients, i. e., a per diem basis during a year, then an adjustment to cost or billed charges, whichever is lesser. In an exhibit covering 1965 through 1971, the costs were less than the billed charges.]

At BCH's meeting in March, 1968, at which it authorized the execution of the new contract, it also directed Mr. Dack to study the propriety of out-of-county charges. Then after executing the new contract, identical with the previous ones, BCH adopted on December 30, 1968, the resolution increasing out-of-county charges to $5.20 a day, effective January 1, 1969. Blue Cross again objected, reiterating its former unwavering position that the charges violated the contract. BCH continued to make the out-of-county charge; Blue Cross started deducting like amounts it had refunded to its members from reimbursements to BCH; and this litigation was begun.

The rule of adoption of an adverse party's construction or interpretation of a contract provision, so as to bar the other party from an assertion to the contrary, has much countenance in the law. "As a general rule, the language of a contract, in case of ambiguity, should be interpreted in the sense that the promisor knew, or had reason to know, that the promisee understood it. So, while it has been held that a party is not bound to perform an act not within the terms of the contract, notwithstanding he knew that the other party understood that he would perform it, according to some cases, a party to a contract generally will be held to that meaning which he knew was in accordance with the understanding of other party, provided this can be done without making a new contract for the parties; * * * ." 17A C.J.S. Contracts § 295 i., pp. 67, 68. In *Bowers Hydraulic Dredging Company v. United States,* 211 U.S. 176, 29 S.Ct. 77, 53 L.Ed. 136 (1908), an excavation contractor was not entitled to extra payment for the removal of earth which had slid into a channel when it knew that the United States had construed a prior contract as not requiring that payment. Note *Cresswell v. United States,* 173 F.Supp. 805, 811[2][3], 146 Ct.Cl. 119 (1959), where the court said, "If one party to a contract knows the meaning that the other intended to convey by his words, then he is bound by that meaning. The same is true if he had reason to know what the other party intended (citing authority and cases)." "Moreover, plaintiff entered into an identi-

cal contract with the Government [the same situation with BCH and Blue Cross here]. * * * A previous contract already performed and already interpreted is strong evidence of the parties interpretation of the disputed contract (citing cases.)." See, for the same propositions, *Perry and Wallis, Inc. v. United States,* 427 F.2d 722, 725, 192 Ct.Cl. 310 (1970); *City of Memphis, Tennessee v. Ford Motor Company,* 304 F.2d 845, 849[8] (C.A.6th 1962); *Jamesbury Corporation v. Worcester Valve Company,* 443 F.2d 205, 210[7–10], Footnote 7 (C.A.1st 1971); *Hamann v. Crouch,* 211 Kan. 852, 508 P.2d 968, 974[4] (1973); and cases cited and quoted. The C.J.S. rule above quoted has found expression in this state. In *Bruner v. Wheaton,* 46 Mo. 363 (1870), the issue was whether plaintiff was entitled to specific performance of an alleged contract proposed and accepted in writing because of her words of acceptance. The facts were that plaintiff wrote an offer to defendant to purchase his property. He answered that he was willing to let plaintiff have the property for $3,000, "fifteen hundred dollars to be paid his agent immediately, and the balance in two years * * *; and * * * if the plaintiff accepted the proposition, she should inform him of the fact, and he would send a deed or power of attorney to his agent and authorize him to arrange the whole affair." Plaintiff wrote and stated she accepted defendant's terms, "that she would pay to his agent the fifteen hundred dollars as soon as the deed was ready, * * *." Defendant offered the defense to the suit "that 'immediately' meant that the money should be paid down at the time of acceptance, without waiting for the reception of the deed * * *." The court rejected that defense and said, "But this is obviously not the sense in which the contracting parties at the time viewed the transaction. It is a just principle of construction, both morally and legally, that the promisor is bound according to the sense in which he apprehended that the promisee received his proposition." The obvious impact of Bruner is that the defendant placed in the mind of plaintiff the conditions for the payment of the $1,500 down payment, to which she responded—that it would be paid when the deed was ready in the agent's hands. See also *Counts v. Medley,* 163 Mo.App. 546, 146 S.W. 465 (1912), construing the words of a sale of business contract that the seller would not engage in competition with the buyer "at" Rogersville was held to mean at or near that place, and included Hendersonville, 1½ miles away, and at 146 S.W. 468[5], reiterating the rule of construction of *Bruner, supra*; and see *Jarman v. Knights Templars' & Masons' Life Indemnity Co.,* 95 F. 70, 76 (Cir.Ct.W. D.Mo.1899).

What has happened here, under the undisputed evidence, BCH, in 1964, acceded to Blue Cross' construction of the hospital service contract that it did not permit the out-of-county charges. In so doing, it waived the discretionary benefits conferred upon it by § 205.270, *supra,* although it could have insisted at the time that the statute controlled its right to make extra charges to nonresidents of Boone County, and that the contract did not bar those charges because they were not for "hospital care"—the position it here maintains. The statutory discretionary right clearly may be waived, 28 Am.Jur.2d Estoppel and Waiver, § 156, p. 838, "It is held that once a waiver of the provisions of a statute is made in a pending case, it is waived for the purposes of all further proceedings in the same action." In 1962, but more conclusively in the latter part of 1964, BCH advised Blue Cross that it accepted the latter's suggestion of the discount method of billings or charges to nonresident Blue Cross members, again on two occasions (1965 and 1968) re-executing the contract provisions containing the identical paragraph 3 provision. By this action, and allowing Blue Cross to execute the same type of contract without remonstrance, under the foregoing authority BCH has adopted Blue Cross' pleaded and proved construction of the contract, and has raised an equitable estoppel against itself now to claim otherwise. 28 Am.Jur.2d Estoppel

and Waiver, § 34, p. 639. Compare *Johnson v. Neel*, 123 Colo. 377, 229 P.2d 939, 944[5–7] (Banc 1951), where a statute conferring a right to jury trial was held waived by failure to request a jury, giving rise to an equitable estoppel; *Kallock v. Elward*, 118 Me. 346, 108 A. 256, 8 A.L.R. 750 (1919), where a married woman was held to waive a statute providing that she could not be arrested, and she was held estopped from claiming the privilege of arrest by failing to reveal that she was a married woman when suit was begun against her; *City of Chetopa v. Board of County Com'rs*, 156 Kan. 290, 133 P.2d 174 (1943), where the city sought to recover under a statute money for the maintenance of streets which connected with a county highway system. The estoppel arose because the city had received payments under a different statute from the county; 31 C.J.S. Estoppel § 61, pp. 386, 387; and *Holmes v. Graves*, 83 Ariz. 174, 318 P.2d 354, 357 (1957), where a defendant who protested or desired that items purchased be noted in detail on a sales pad, was estopped from demanding items of account in writing as provided by civil rule, the court saying, "Statutory provisions enacted for the benefit of individuals may be so far waived by those for whose benefit they were enacted that they are estopped to insist upon their protection. *Mulhall v. Nashua Mfg. Co.*, 80 N.H. 194, 115 A. 449."

■ There remains Blue Cross' appeal from the denial by the trial court of its counterclaim which was for alleged "out-of-pocket" expenses occasioned by BCH's claimed breach of the agreement. It is said by Blue Cross that the breach caused it additional expense in office work in contacting many nonresident of Boone County Blue Cross members to give them refunds for the "out-of-county" charge imposed by BCH upon them. It is unnecessary to rule whether Blue Cross was obligated to make those refunds. The issue turns upon Blue Cross' proof of damages. The evidence from Blue Cross' Mr. Olwig, manager of cost and budget accounting, was that he made a study of the additional work entailed in contacting and refunding to Blue Cross members, for 3 years, 1970, 1971 and 1972. The study resulted in an allocation of time spent by a regular employee in the claims office, Mrs. Carolyn Guiott, in handling the extra work of about 3 hours a day, over and above her regular duties. Her salary for the 3 year period was allocated on an hourly percentage basis resulting in a claimed $11,837 extra wages. Other costs, such as check writing, stenographer, and mailroom were likewise allocated. There is no showing that there were any additional actual costs incurred, other than Blue Cross' use of its regular employees, in performing the tasks. All employees, including Mrs. Guiott, were full-time employees both before and after the work was performed. There was merely a readjustment of the work force, a "shuffling around" of employees, and no additional people were hired. Blue Cross cites no case that this arrangement amounts to out-of-pocket expenses for which it is legally entitled to reimbursement. To allow it on these facts would permit Blue Cross to realize a profit from the situation. 25 C.J.S. Damages § 71, p. 838. *Dingman v. Elizabeth Arden Sales Corp.*, 284 S.W.2d 16, 18[2] (Mo.App.1955). See *Kansas City Bridge Co. v. Kansas City Str. Steel Co.*, 317 S.W.2d 370, 376[2] (Mo. 1958), disallowing as damages allocation of certain overhead expenses which did not increase or decrease on account of delay in a Leavenworth bridge job. "As noted, all of the items with which we are here dealing were fixed and, thus, plaintiff's total overhead was exactly the same whether there had been any delay in the Leavenworth job and exactly the same during the period of delay and exactly the same thereafter." (317 S.W.2d 377.) Blue Cross has shown no money damage to itself occasioned by doing the extra work with regular employees.

The judgment against Blue Cross on its counterclaim is affirmed. The judgment in favor of Boone County Hospital, et al., against Blue Cross, is reversed.

All concur.