**CITIZENS NATIONAL BANK,**
**Respondent,**

v.

**William C. HANES, Appellant.**

**No. KCD 27489.**

Missouri Court of Appeals,
Kansas City District.

Aug. 30, 1976.

James F. Duncan, Dennis R. Rilinger, Kansas City, for appellant.

Robert L. Shirkey, Kansas City, for respondent.

Before DIXON, P. J., PRITCHARD, C. J., and WASSERSTROM, J.

WASSERSTROM, Judge.

Citizens National Bank sues Hanes on his guaranty of loans made by the Bank to Allied Broadcasting Company. The trial court, after hearing without a jury, entered judgment for the Bank. Hanes appeals.

The facts are undisputed. On January 5, 1970, Allied had 23 stockholders of whom 19 owned 320 shares each and four of whom owned 160 shares each. Allied had become financially straitened and needed bank loans. The Bank was willing to extend the needed money, but only if all of Allied's stockholders would personally guarantee the loans. In response to that demand, all of the then existing 23 stockholders did give their personal guaranties in proportion to their respective stock holdings.

Hanes, like the other stockholders, signed such a guaranty. However, he added to his the following insertion written in his own hand:

"Not withstanding any of the above, this guaranty shall become effective only if similiar [sic] guaranties shall be in effect by *all* shareholders of Allied and shall be void at any time that any Allied shareholder does not have a similiar [sic], proportionate guarantee in effect." (emphasis in the original).

Subsequent to the giving of these guaranties, additional capital stock totaling 30,-000 shares was issued by Allied. Of these 30,000 shares, 24,200 were acquired by those who had already been shareholders on January 5, 1970. Six new shareholders acquired the remaining 5,800 shares. None of the new shareholders were requested to give guaranties to the Bank, and none of the 21 old shareholders who increased their stock holding gave any new or increased guaranties.

By mid 1971, Allied's financial position deteriorated to the point where it defaulted on its bank obligations, and on July 20, 1971, the Bank wrote to Hanes demanding payment by him under his guaranty. To that demand, Hanes responded by letter (Exhibit 15) dated July 26, as follows:

"Please send me a zerox copy of my guaranty agreement and a list of all shareholders whose guaranty you have.

"My guaranty was limited to the ratio of shares which I held as a per cent of the shares outstanding and was valid only if all other then shareholders also ᴑuaranteed this debt."

The Bank supplied the list so requested, but the dispute between the parties continued. By letters dated October 28, 1971 (Exhibit 12) and December 14, 1971 (Exhibit 13), Hanes continued to assert his freedom from liability by reason of his addendum to the guaranty. In the October and December letters, however, he broadened his position from that stated in the July letter, in that in the latter two letters he emphasized that "*all* shareholders are not involved and were never involved and no relationship to stock ownership has been maintained" and that "I had made a decision against any enlargement of my position in Allied and felt sure that it would be necessary for others to provide equity capital and this would obviously dilute my earning opportunity if the corporation succeeded so I therefore desired to correspondingly limit my loss potential." Despite these letters from Hanes, the Bank continued to insist upon his liability under the guaranty. Faced with his refusal to pay, the Bank filed this suit.

Hanes assigns as error, first, that he should have received judgment as a matter of law because the handwritten addendum unambiguously voided his obligation under the admitted facts. Alternatively, as his second point, he contends that if the guaranty can be considered as ambiguous, then the intrinsic evidence received by the court fails to support any interpretation which would make him liable. Neither of those points can be sustained.

The cases recognize that an ambiguity in an instrument can be either patent or latent. A patent ambiguity is one which is apparent on the face of the instrument. A latent ambiguity, in distinction, occurs where an instrument is unambiguous on its

face but becomes open to more than one interpretation when applied to the factual situation in issue. *Boone County v. Blue Cross Hospital Service,* 526 S.W.2d 853, 857 (Mo.App.1975) and cases there cited.

In the situation here, there were only 6720 Allied shares outstanding in the hands of 23 shareholders on January 5, 1970, when Hanes' guaranty was executed. By the time of Allied's default, 30,000 additional shares had been issued with six additional shareholders. The language inserted by Hanes by way of addendum to the guaranty (that the guaranty shall be void if any shareholders ceased to have a similar proportionate guarantee in effect) could reasonably be thought to have reference to either the shareholders and shareholdings as of January 5, 1970, or the larger number of shareholders with different shareholdings as of the time of default in mid 1971. Because of this uncertainty, the guaranty does contain a latent ambiguity.

Looking at all of the circumstances of the case, the trial court properly concluded that the addendum in question did refer to the shareholders and their holdings as they existed on the date of the guaranty, January 5, 1970. One basis lending support to this interpretation is the fact that Hanes' handwritten insertion immediately follows and is made a part of the same paragraph which provides in the typewritten portion as follows:

"This guaranty shall be a continuing guaranty, provided that it may be discontinued as to any of the undersigned only by his giving written notice by registered mail to the Bank of the discontinuance of this guaranty as to the undersigned giving such notice, but no such notice shall be effective in any respect until it is actually received by the Bank and shall not affect the obligations hereunder of the undersigned giving such notice or the Bank's rights or authority hereunder with respect to any Bank Debt existing at the date of receipt of such notice by the Bank, any interest subsequently accruing thereon or any expenses incurred by the Bank in endeavoring to collect any of such Bank Debt and in enforcing this guaranty against such undersigned. This guaranty shall survive the death of any of the undersigned, provided that upon actually receiving written notice, sent to the Bank by registered mail, of the death of any of the undersigned the Bank shall be deemed to have thereby received a notice of discontinuance on behalf of such deceased undersigned. Any such notice of discontinuance by any of the undersigned shall not affect the obligations hereunder of any other of the undersigned."

The trial court deemed the second half of Hanes' insert to be a response to and limitation upon the effect of this paragraph immediately above quoted. As the trial court stated in his ruling, Hanes should be understood as saying "[i]f any of the others withdraw, you can assume I am withdrawing too." Although Hanes now argues that the second half of his insert was intended to require a new guaranty with respect to ownership of any new stock, the trial court's interpretation that this clause had reference to the typewritten provision to which the addendum was appended is the more persuasive construction.

Also persuasive in favor of the trial court's view is Exhibit 15, the letter written by Hanes dated July 26, 1971. In that letter to the Bank he placed his defense against liability exclusively on the ground that his guaranty "was valid only if all other *then* shareholders also guaranteed this debt." (Emphasis added). Hanes admitted in his testimony that at the time he wrote this letter he was aware that additional stock had been issued by Allied subsequent to January 5, 1970, and that some of the new shareholders had not been owners of stock on the earlier date. Yet, despite this knowledge, he limited his defensive stance to one involving only the "then" shareholders as of January 5, 1970, and he made no point at all with respect to whether the new shareholders had joined in the guaranty or the old shareholders who increased their holdings had correspondingly expanded their respective guaranties.

Recognizing the adverse impact of the July 26, 1971, letter, defense counsel tried to explain it away on the ground that Hanes did not have a copy of his guaranty agreement when he wrote the July 26 letter, and that he had forgotten the terms thereof. This appears explicitly during the course of a colloquy between the trial court and defense counsel as follows:

"THE COURT: Then does it follow from your position that you are saying that your client, in Plaintiff's Exhibit 15, misinterpreted this unambiguous language?

MR. DUNCAN [Defense Counsel]: Excuse me. May I see it? I don't think so, Your Honor. I think it's quite clear that he was only speaking from memory at this point. He did not have a copy of the guaranty agreement. He was writing to the bank saying, 'Please send me a copy of the guaranty agreement.' * * * He did not have before him a copy of the guaranty when he wrote 15. When he got the guaranty he wrote 12.

THE COURT: You are not taking the position that Exhibit 15 says that it was his understanding it should be proportinate [sic] to all shareholders as distinguished from proportinate [sic] to the then shareholders? You concede it says in this it be proportinate [sic] to the then shareholders based on his faulty recollection?

MR. DUNCAN: Based on his faulty recollection, yes, sir.

THE COURT: I wanted to be sure.

MR. DUNCAN: Yes, sir."

Yet when Hanes himself took the stand, he flatly repudiated that attempted explanation by his counsel. The record shows the following questioning of Hanes by the court:

"THE COURT: * * * Now, my question is to you, sir, if you felt as strongly about this matter as you have indicated at the time, that is before the guaranty was made, and if you felt as strongly as you indicated in the second paragraph of your letter of December 14, 1971, how do you explain the fact when you wrote this letter, which was Exhibit 15, that you had forgotten that was your position?

THE WITNESS: Exhibit 15? Exhibit 15 was just merely a response that I received when payment was demanded, and *I'm not taking the position that I had forgotten anything at that time.* I knew that my guaranty, or at least I thought it was, fully conditioned upon the guaranty being *and remaining proportionate.* * *

THE COURT: Then you don't agree with your attorney's interpretation of that language?

THE WITNESS: *I heard him say maybe I forgot. I didn't forget what the deal was.*" (emphasis added).

Confronted with his client's disagreement with the first attempted explanation for Exhibit 15, his counsel now makes another effort to explain the July 26, 1971, letter (Exhibit 15) by arguing in his brief in this court that "[t]he obvious and correct interpretation of this letter is that defendant was referring therein only to the condition precedent." (By condition precedent defense counsel is referring to the first part of the addendum to Hanes' guaranty which reads "this guaranty shall become effective only if similiar [sic] guaranties shall be in effect by *all* shareholders of Allied . . . .").[1] The short answer to this fallback position is that Hanes in his testimony quoted admitted that he was aware at the time he wrote Exhibit 15 that his guaranty required the guaranty of other shareholders being *and remaining* proportionate. This reflects that Hanes in writing Exhibit 15

1. Hanes' brief distinguishes the two parts of the addendum as follows: "The first clause of the provision stated a condition precedent, under which defendant's liability under the guaranty agreement was conditioned upon plaintiff's obtaining proportionate guaranties from all twenty-three individuals holding Allied stock on January 5, 1970. The second clause of the provision stated a condition subsequent under which defendant's liability under the guaranty agreement was voided if plaintiff failed to have similar proportionate guaranties from all Allied shareholders at any time."

had in mind all of the addendum, not merely the first part of it. Exhibit 15, supplemented by Hanes' testimony, strongly tends to show that the whole of Hanes' addendum referred solely to those shareholders and the shareholdings as they existed on January 5, 1970.

A third consideration influenced the trial court's interpretation of the intention of the addendum in question and also carries persuasive effect. All parties in interest knew that Allied was having financial trouble, that additional stock had been issued from time to time subsequent to the original incorporation, and that still further floatation of additional shares might be required subsequent to January 5, 1970. Most certainly all these parties must have realized that the sale of additional shares would be sharply discouraged, if not made completely impossible, by a requirement that the purchaser of additional shares not only pay for those shares, but also incur a personal obligation by way of guaranty of past corporate indebtedness. Hanes himself admitted that, "[i]t wouldn't increase its marketability if in addition to paying for the stock people were guaranteed—required to guarantee a prior loan." As stated by the trial court, such an intended meaning "would have virtually taken away any hope that they had to appeal to people outside to come in and help them by selling stock to outsiders."

In sum, the trial court committed no error in ruling the guaranty agreement ambiguous and interpreting it as imposing liability upon Hanes under these circumstances.

Affirmed.

All concur.