INDUSTRIAL INDEMNITY COMPANY, a California Corporation, and Fedcon Corporation, a Missouri Corporation, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 570–84C.

United States Claims Court.

Feb. 4, 1988.

F. Philip Kirwan, Kansas City, Mo., attorney of record for plaintiffs; Margolin & Kirwan of counsel.

Terrence Hartman, Dept. of Justice, Washington, D.C., with whom was Richard K. Willard, Asst. Atty. Gen., attorneys for defendant.

OPINION

ROBINSON, Judge.

This action is before the Court on Cross-motions for Summary Judgment filed pursuant to Rule 56(b) of the Rules of the United States Claims Court by the plaintiffs and defendant. The plaintiffs are a contractor and its surety. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1491(a)(1) and 41 U.S.C. § 609(a)(1). The claim is founded upon an express contract between the plaintiff FEDCON and the United States. The defendant's Motion for Summary Judgment is granted and the plaintiffs' Cross-motion for Summary Judg-

ment is denied for the reasons which follow.

*Factual Background*

On March 24, 1983, FEDCON Corporation entered into Contract No. DACA 67–83–C–0041 (Contract) with the United States for the sum of $6,445,360, covering the construction of a helicopter hangar apron, parking pads, hoverlanes, wash area, access road, parking lot, and storage area for the 1st and 2nd Attack Helicopter Battalions at Fort Lewis, Washington.

On April 4, 1983, Industrial Indemnity Company, acting as surety for FEDCON issued performance bond No. 8536505 in the penal sum of $6,445,360, naming the United States as obligee. The bond was conditional upon, *inter alia*, FEDCON's performance of all the undertakings, covenants, terms, conditions, and agreements of the Contract. FEDCON received the notice to proceed on April 18, 1983. The work was to be completed in 365 calendar days after receipt of the notice to proceed.

The solicitation which resulted in the Contract contained separate bid items. The solicitation called for Item No. 1, the helicopter hangar "complete to a line 5 feet outside the building walls, except Item Nos. 3 through 7," to be bid on a lump sum basis. The solicitation called for Item No. 2, "site work and utilities outside the line 5 feet outside the building walls, except Item Nos. 3 through 7," to be bid on a lump sum basis. Item No. 3, "Excavation," and Item No. 4, "Satisfactory Borrow Material," were each bid on the basis of a unit price per cubic yard.

Under the heading "CEMENTING MATERIALS FOR CONCRETE PAVEMENT," the solicitation contained alternative bid items. The contractor was to bid either on Item No. 5, "Portland cement," or on Item No. 6, "Portland cement (used with pozzolan class F)," on the basis of a unit price per hundredweight (CWT). FEDCON elected to bid on Item No. 5, "Portland cement" and the Contract was awarded on that basis.

Finally, Item No. 7, "water-reducing admixture" was bid on the basis of a combined price: a lump sum for the mobilization and demobilization of storage, batching, and recording equipment, and a unit price per cubic yard for the water-reducing admixture.

The Corps of Engineers on February 28, 1983, received oral inquiries from one of the competing bidders on the project, Mr. Bruce Blake, seeking clarification of items under the Contract to which the Corps of Engineers responded orally. These inquiries were addressed to Mr. Will Aldridge, who wrote two memoranda both dated February 28, 1983, describing these inquiries and his responses thereto. Thereafter, FEDCON, by letter dated July 12, 1983, wrote to the Department of the Army regarding the Contract in which FEDCON expressed the view that due to the exception clause in the Contract, "the cement used in the foundation, slabs, electrical and mechanical concrete will be paid for by Bid Item No. 5." Further, the letter stated: "Conversations with people in your office have left us with the feeling that this is not the case." The letter closed by stating that FEDCON wished a response from the Department of the Army prior to the starting of building concrete work regarding FEDCON's interpretation of the Contract that *all* Portland cement would be paid for based on quantity, under Item No. 5.

The Contracting Officer's representative, James D. Lonsford, responded to FEDCON by letter dated August 29, 1983. The letter rejected FEDCON's interpretation and directed attention to the fact that Item No. 5 pertained only to cementing materials for concrete *pavement*. It further directed attention to paragraph 2.2 of the Contract, Technical Provision 1C, which states:

> The quantity of "Portland Cement" to be paid for will be the number of short CWT (100 pounds) of "Portland Cement" actually used in the completed and accepted *pavements*.

The letter also stated:

> We conclude that the cement used in the hangar is to be paid for under Bid Item 1. *Only the cement used in the pavement, including, the pavement from the building wall to a line five feet*

*outside the building will be paid for under Bid Item 5.* (emphasis added)

On September 9, 1983, FEDCON sent a letter to the Army requesting a Contracting Officer's decision in writing, pursuant to the "disputes" clause of the Contract. In a decision dated November 3, 1983, the Contracting Officer denied FEDCON's claim finding it without merit. The Contracting Officer's opinion states:

It is clear that the Bid Items for portland cement, pozzolan and water-reducing admixture are for *pavement* concrete only. The many references to pavement directly conflict with your assertion that Bid Item 5 is to cover slabs, foundations and utility concrete. They are entirely consistent, on the other hand, with the notion that Item 5 covers those portions of *paved* areas lying within 5 feet of the hangar walls, and that the lump sum price for Bid Item 1 covers all remaining concrete associated with the building. The distinction between pavement and building concrete is further demonstrated by the separate treatment given each in the Technical Provisions of the contract, and by the fact that there is a provision for measuring quantities used in paving (Para. 8.2 of TP 2I), but none for measuring quantities used in building construction.

### The Issue

The central issue in this action is whether Bid Item No. 5, providing for payment for Portland cement based upon quantity, which appeared in capital letters under the heading "CEMENTING MATERIALS FOR CONCRETE PAVEMENT," covers only the Portland cement used for the concrete pavement surrounding the hangar building.

### The Contentions of the Parties [1]

The plaintiffs contend that Bid Item No. 1 relating to the hangar and to a line five feet outside the hangar wall, excepts, among other items, Item No. 5 which describes "Portland cement" but contains no

limitation with respect to incorporation of Portland cement into the project, or, specifically into the hangar building itself. Further, plaintiffs contend that notwithstanding Section 1C—*Measurement and Payment*, which precludes payment for work under but one item in the Contract, and notwithstanding the use in the heading for Item 5 of the term "pavement" as it relates to Portland cement, the Contract does not eliminate cement used in the hangar building from coverage under Bid Item No. 5. Further, plaintiffs argue paragraph 1 of Section 1C means only that Portland cement paid for under Bid Item 5, inclusive of cement used in the hangar, cannot be considered for payment under Bid Item No. 1, the hangar building. Thus, plaintiffs contend that the Contracting Officer's decision regarding payment for the paving concrete from the building wall to the 5–foot line outside the building wall under Item No. 5 contradicts the express provisions of the Contract.

Plaintiffs allege that an interested bidder for the project, Mr. Bruce Blake, received a response from the Corps of Engineers that Portland cement used *anywhere* on the project, including the hangar building itself, would be paid for under Bid Item No. 5. Plaintiffs aver that this interpretation is correct particularly in view of paragraph 18.1 of Section 3A permitting construction of the hangar floor slabs "in accordance with the requirements of Section 2I: Concrete Pavement for Airfields."

Plaintiffs also contend that the definition of the term "pavement" is sufficiently broad to encompass foundations, utilities, floor slabs and walls in the hangar. Plaintiffs argue that if the Corps of Engineers had wanted to provide for payment for Portland cement used in the hangar under Bid Item No. 1, it could have done so specifically as it did with respect to the provision covering payment for *Excavation*, Paragraph 3.3, Section 1C.

Plaintiffs contend that since a "reasonable" interpretation of the Contract could

---

1. The relevant contract provisions on which the parties base their contentions are appended to this Opinion.

result in different interpretations as to the meaning of Item No. 5, the interpretation which is most favorable to the party that did not draw the Contract is the one which must be given.

Finally, plaintiffs argue that the provisions regarding Portland cement are ambiguous, and that this ambiguity was called to the attention of the defendant by Mr. Blake's inquiry. Plaintiffs contend that even though the defendant's response to Mr. Blake may not be binding, it is "indicative" of the true intent and meaning of the specifications in question and evidence of the ambiguity created by the government-drawn Contract.

The defendant counters that Item No. 5, the only exception item pertaining to Portland cement, is under the heading, in capital letters, "CEMENTING MATERIALS FOR CONCRETE PAVEMENT," which indicates that it covers payment for pavement concrete only. Further, since the Contract provides that work paid for under one item will not be paid for under any other item, payment for materials, including Portland cement in the hangar building, is reflected in the lump sum price of that item. Further, defendant contends, Portland cement is addressed in the Contract separately under Section 2—*Measurement,* with a reference to that quantity used in *completed and accepted pavements* which would apply only to the hangar apron, helicopter parking pads, hoverlanes, wash areas, access road, parking lot, and storage area. Also, defendant contends that under the heading "CEMENTING MATERIALS FOR CONCRETE PAVEMENT," the payment for pozzolan and water-reducing admixture (Item Nos. 6 and 7) are to be separately paid for only in the context of use for *pavements.*

Defendant argues that the Contract is clear and definite on its face. Defendant contends that if the Contract provisions are given their plain and ordinary meaning, such provisions mean, if construed to effectuate the spirit and purpose of the Contract and to give a harmonious and reasonable meaning to all parts of the Contract, that the hangar and all materials used in it, were to be covered by one lump sum price.

Finally, defendant argues that the meaning of the term "pavement" is obvious, and in this Contract "pavement" did not include building concrete consisting of foundation, slabs, and utility concrete.

Defendant, in its response to plaintiffs' Cross-motion for Summary Judgment, states that Mr. Willard Aldridge, who was at least twice contacted by Mr. Blake about the Contract, did not tell Mr. Blake that all Portland cement was to be paid for under Item No. 5. Defendant argues that with respect to the defendant's Motion for Summary Judgment, the dispute about the conversation between Messrs. Blake and Aldridge does not constitute an issue of material fact because "the Court's determination of whether the Contract language is clear and definite on its face and supports the Government's position is unaffected by the correctness of plaintiffs' allegations." However, defendant contends conversely that because plaintiffs rely upon the alleged statement by Mr. Aldridge that all cement was included in Item No. 5 to demonstrate the reasonableness of their interpretation, the disagreement constitutes an issue of material fact with respect to plaintiffs' Cross-motion for Summary Judgment. This issue of material fact thus bars the Court from granting plaintiffs' motion. Further, defendant argues that the addition to paragraph 18.1, Floor Slabs on Grade: Vapor Barrier, of Section 3A, allowing the Contractor to construct the hangar floor *slabs* in accordance with the requirements of Section 2I: *Concrete Pavement for Airfields,* was limited to the technical matter of construction methods and in no way concerns terms of payment. Defendant contends that Messrs. Blake and Aldridge discussed only questions about construction methods arising from this modification.

Defendant also argues that if the Court determines that the Contract is ambiguous, then the ambiguity is patent and apparent on the face of the Invitation For Bids. Such a patent ambiguity requires the contractor to bring the situation to the Govern-

ment's attention if he intends to resolve the issue in his own favor because of the duty to seek clarification to remove the ambiguity regardless of the reasonableness of the Contractor's interpretation. Defendant points out that the "Instructions To Bidders" require a bidder to make all inquiries in writing and to allow sufficient time for a written response to all bidders. Defendant contends that since plaintiffs knew of a possible ambiguity from pre-contract discussions with Mr. Blake prior to submitting its bid, whether the ambiguity was patent or latent would make no difference because the plaintiffs had the duty to seek verification. Thus, defendant argues the rule of *contra proferentem* does not apply.

Defendant lastly argues that if the ambiguity is determined to be latent rather than patent, then the plaintiffs' interpretation must be a reasonable one. In this case, the defendant contends the plaintiffs' interpretation is outside the "zone of reasonableness" because the Contract provision, Item No. 5, is clearly applicable only to the cement used for concrete pavements as a result of the heading above Item No. 5, which cannot be ignored under principles of reasonable interpretation. Thus, defendant concludes that the plaintiffs' contention that the term "pavement" includes any flat surface including walls, foundations, and electrical and mechanical concrete, is unreasonable.

In contravention of defendant's Affidavit of Mr. James D. Lonsford, plaintiffs, in reply, submit the affidavit of Mr. Sidney Gearllach, to which is attached a Payment Estimate indicating that it apparently is not against Government practices for the Government to specify building concrete, in this case, concrete pavement for airfields and hangar floor slabs, as a unit price payment item.

### Discussion

Summary disposition requires that no genuine dispute exist as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor...." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513 (citation omitted). As the opponent of summary judgment, plaintiffs shall "receive the benefit of all applicable presumptions, inferences, and intendments." *Orchards v. United States,* 749 F.2d 1571, 1574 (Fed. Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). The court should "resolve all doubt over factual issues in favor of the party opposing summary judgment." *Litton Indus. Prod., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985).

The movant has the burden of establishing that there is no material fact in dispute and that it is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Molinaro v. Fannon/Courier Corp.,* 745 F.2d 651, 653–54 (Fed.Cir.1984). A summary judgment motion must be denied if a genuine issue of material fact exists. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608. However, the party opposing the motion has the burden of showing sufficient evidence, not necessarily admissible at trial, that there is a genuine issue of material fact in dispute. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Mere denials or conclusory statements are insufficient." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 836 (Fed.Cir.1984). The materiality of the facts before the court will be viewed in light of the legal standard to be applied to the case. *Anderson,* 477 U.S. at 251–53, 106 S.Ct. at 2512.

Two factors to be considered in deciding if a case is a proper one for summary judgment are whether the material facts necessary for decision have been adequately developed, as required by RUSCC 56(c), and whether further litigation would put the parties to unnecessary expense and would also waste judicial resources. The Supreme Court emphasized the importance of Fed.R.Civ.P. 56 for purposes of judicial economy in *Celotex Corp.:* "Summary

judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1, which is identical to RUSCC 1(a)(2)); *see also Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1571 (Fed.Cir.1984); *Frangella Mushroom Farms, Inc. v. United States*, 229 Ct.Cl. 578, 583 (1981).

Each party contends that with respect to its own Motion for Summary Judgment, there are no material facts in dispute. Although each party argues there are facts in dispute which would prevent the Court from granting the opponent's motion, the Court has concluded that the disputed facts are not of sufficient magnitude or materiality as to require a trial. Therefore, the Court has determined that the matter is properly before the Court for disposition on Motions for Summary Judgment.

■ Contract interpretation is a matter of law. *Dynamics Corp. of America v. United States*, 182 Ct.Cl. 62, 389 F.2d 424 (1968); *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 351 F.2d 972 (1965); *Max Drill Inc. v. United States*, 192 Ct.Cl. 608, 427 F.2d 1233 (1970). "The avowed purpose and primary function of the court is the ascertainment of the intention of the parties." 4 Williston, Contracts § 601 (3d ed. 1961); *Dynamics Corp. of America*, 182 Ct.Cl. at 72, 389 F.2d at 429. In attempting to give effect to the contracting parties' intent, the court is guided by the principles that "[t]he parties' intent must be gathered from the instrument as a whole." *ITT Arctic Services, Inc. v. United States*, 207 Ct.Cl. 743, 751, 524 F.2d 680, 684 (1975), *citing Kenneth Reed Constr. Corp. v. United States*, 201 Ct.Cl. 282, 288, 475 F.2d 583, 586 (1973). The Court must give a reasonable meaning to all parts of the instrument rather than leaving a portion of it useless, *Martin Lane Company, Inc. v. United States*, 193 Ct.Cl. 203, 215, 432 F.2d 1013, 1019 (1970), from the perspective of "a reasonably intelligent person

acquainted with the contemporary circumstances." *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971); *ITT Arctic Services, Inc.*, 207 Ct.Cl. at 752, 524 F.2d at 684. In addition, a Court should ascribe to the contract language "its ordinary and commonly accepted meaning," *Hol–Gar Manufacturing Corp.*, 169 Ct.Cl. at 390, 351 F.2d at 972, without twisted or strained analysis, *Aero Mayflower Transit Co. v. United States*, 162 Ct.Cl. 233 (1963). Thus, the Court finds that meaning must be given to the defendant's reading of the heading, "CEMENTING MATERIALS FOR CONCRETE PAVEMENT." Therefore, the plaintiffs' interpretation of the Contract, specifically the meaning of the heading for Item Nos. 5 and 6 relating to Portland cement, is in error.

■ The plaintiffs' reading of the Contract ignores the plain and unambiguous meaning of the heading's words. These words were clearly not intended to cover payment on a unit price for Portland cement used anywhere except as *pavements*. This interpretation is consistent with the other provisions of the Contract which also specifically refer to *pavements*. Section 1C, paragraph 2.2.

From the standpoint of a knowledgeable and experienced contractor, it would appear to be totally unreasonable to construe "pavement" to include hangar foundations, walls, and slabs. Even the dictionary defines "pavement" as a "flat or firm *level* surface for *travel*" or "an artificially covered surface of a public thoroughfare." Concrete foundations which are placed to support perpendicular walls are not used for travel or as a surface of a public thoroughfare. Certainly the walls themselves are not used for travel or as a public thoroughfare, nor are they level. Hangar floor *slabs*, although flat and level, are not used for travel or as a public thoroughfare either. Common sense dictates that hangar concrete floor *slabs* are placed to support aircraft during storage and maintenance, any interior wall partitions, machinery, offices, furniture, and the like. Moreover, the Contract distinguishes between pave-

ment and building concrete by the separate treatment given each in the Technical Provisions of the Contract, specifically paragraphs 1, 2.2, and 3.1.

Further, the Contract had under the heading "CEMENTING MATERIALS FOR CONCRETE PAVEMENT," provisions for separate payment for pozzolan and water-reducing admixture (Item Nos. 6 and 7) only in the context of use for *pavements.* The correct interpretation of Item No. 5 of the exception clause is that this item covers all pavement lying within 5 feet of the hangar walls and all other pavement surrounding the hangar building, including the hangar apron, parking pads, hoverlanes, wash areas, access roads, parking lot, and storage area. This interpretation gives to the key words in the Contract their plain and ordinary meaning. *Thanet Corp. v. United States,* 219 Ct.Cl. 75, 591 F.2d 629 (1979). This interpretation, in the Court's view, effectuates the spirit and purpose of the Contract and harmonizes and gives meaning to all its provisions. *ITT Arctic Services, Inc. v. United States,* 207 Ct.Cl. 743, 524 F.2d 680 (1975). Thus, the relevant Contract provisions are consistent and give reasonable meaning to all of its parts. *Hol–Gar Manufacturing Corp. v. United States,* 169 Ct.Cl. 384, 351 F.2d 972 (1965).

The Court finds that the Contract on its face is not ambiguous and may not be challenged for uncertainty. *Bowers Hydraulic Dredging Co. v. United States,* 211 U.S. 176, 29 S.Ct. 77, 53 L.Ed. 136 (1908). The Court reaches this conclusion notwithstanding the testimony of Mr. Blake regarding his inquiries addressed to Mr. Aldridge which testimony for purposes of defendant's motion for summary judgment is accepted as true. Assuming that Mr. Aldridge made the statement to Mr. Blake that building concrete was also covered under Item No. 5, such statement was clearly erroneous and in direct conflict with the clear provisions of the Contract. The Court, therefore, finds that Mr. Aldridge's statement, assuming it was made as reported by Mr. Blake, is insufficient to create an ambiguity with respect to the proper interpretation of the meaning of Item No. 5.

The Contract specifically in describing the hangar *floor* always uses the term *floor slab.* One example is paragraph 18.1, Floor *Slabs* on Grade: Vapor Barrier, of Section 3A, which was amended to allow the Contractor to construct the hangar floor *slabs* in accordance with the requirements of Section 2I: *Concrete Pavement for Airfields.* This amendment indicates that the Contractor could use the same construction *methods* as would be used in laying down the *pavement for airfields;* i.e., the pavement outside the hangar. If a hangar floor slab was intended to be included in the term "pavement," the amendment would not have been necessary. The use of the method would be automatic. Thus, the amendment obviously had nothing whatever to do with terms of payment; rather, the amendment addressed only technical aspects of construction of the hangar.

The affidavit of Mr. James D. Lonsford states that as a Construction Engineer and Resident Engineer for the Corps of Engineers for well over 18 years, he has never seen unit pricing used for building concrete. However, plaintiffs submitted the affidavit of Mr. Gearllach which had attached a copy of pages from an actual contract between B.B. Anderson Construction Co., Inc., and the Government showing the payment estimate for a concrete pavement for airfields and hangar floor slabs "on a cubic yard (C.Y.) basis." This evidence was submitted by plaintiffs to indicate that payment for "building concrete" has been provided for in similar contracts as a unit price item. The Court is persuaded by this evidence that using unit pricing for concrete for building slabs is not without some precedent but would be extremely rare in hangar and airfield building construction contracts. Thus, this evidence is persuasive that had the Government intended to cover unit payment for Portland cement in the concrete to be used in the floor slab, it would have said so in the same form and terminology as was used in the Anderson contract; i.e., with a specific mention of the concrete to be used in the floor slab on a cubic yard basis.

If the Court is wrong in its interpretation of the Contract and there is ambiguity with respect to the reach of the exception and its application to building concrete, the Court is of the opinion that the ambiguity is obvious and therefore not latent but patent. The plaintiffs executed the Contract before properly bringing this possible ambiguity to the attention of the Corps of Engineers' representative, Mr. Aldridge. In fact, the plaintiffs' obligation is to bring an ambiguity, an obvious and significant inconsistency, to the Government's attention in writing *even before bidding* if the plaintiffs intend to resolve the issue in its own favor. *Space Corp. v. United States*, 200 Ct.Cl. 1, 5, 470 F.2d 536, 538 (1972); *S.O.G. of Arkansas v. United States*, 212 Ct.Cl. 125, 128, 546 F.2d 367 (1976). This procedure is a fair requirement of contractors because it protects other bidders on the same specifications before anyone is legally bound. *Newsom v. United States*, 230 Ct.Cl. 301, 303, 676 F.2d 647, 649 (1982). The plaintiffs failed in their duty to follow the procedures set out in Paragraphs 1 and 11 of the Invitation for Bid which require a contractor to obtain a clarification and resolution of the ambiguity beforehand. This failure obviates the entitlement of plaintiffs to any equitable adjustment to cover the cost of Portland cement used in the hangar. Additionally, there is some evidence that the plaintiffs not only should have known, but actually knew of any possible ambiguity from their pre-award conversations with Mr. Blake. In any event, the rule of *contra proferentem,* in these circumstances is not applicable. *James E. Mann v. United States*, 210 Ct.Cl. 104, 122, 535 F.2d 51, 61 (1976).

In summary, based upon the affidavit of Mr. Lonsford, the wording of the heading for Item No. 5, the plain meaning of all of the provisions of the Contract, including the Technical Provisions, when interpreted in a reasonable fashion so as to give effect to all pertinent contract provisions in a harmonious way, the Court finds that the Contract is not ambiguous, Bid Item No. 5 does not apply to building concrete, and therefore, the plaintiffs are not entitled to an equitable adjustment. If the Contract is determined to be ambiguous, the Court further finds that the ambiguity is patent and the plaintiffs failed in their duty to properly bring this ambiguity to the attention of the defendant before entry into the Contract. Thus, the plaintiffs are not entitled to an equitable adjustment.

### Conclusion

The record indicates that there are no genuine issues as to any material fact. The facts, considered in a light most favorable to plaintiffs, entitle the defendant to a judgment as a matter of law. Therefore, the Court hereby grants defendant's Motion for Summary Judgment and denies the plaintiffs' Cross-motion for Summary Judgment. The Clerk of the Court is directed to dismiss the Complaint. No costs.

### APPENDIX
#### BID ITEMS AS SET OUT IN THE CONTRACT'S SCHEDULE A

| Item No. | Description of Bid Item | Estimated Quantity | Unit | Unit Price | Estimated Amount |
|---|---|---|---|---|---|
| 1. | First & Second Attack Helicopter Battalions Hangar complete to a line 5 Feed Outside the Building Walls, Except Items Nos. 3 through 7 | 1 | JOB | L.S. | $3,730,000 |
| 2. | Sitework and Utilities Outside the Line 5 Feet Outside the Building Walls, Except Items Nos. 3 through 7 | 1 | JOB | L.S. | $1,920,000 |
| 3. | Excavation | 140,000 | C.Y. | 2.70 | $ 378,000 |
| 4. | Satisfactory Borrow Material | | | | |
| | (a) First 8,000 C.Y. | 8,000 | C.Y. | 3.70 | $ 29,600 |
| | (b) Over 8,000 C.Y. | 8,000 | C.Y. | 3.70 | $ 29,600 |

| Item No. | Description of Bid Item | Estimated Quantity | Unit | Unit Price | Estimated Amount |
|---|---|---|---|---|---|
| | CEMENTING MATERIALS FOR CONCRETE PAVEMENT | | | | |
| | ALTERNATES TO BID FOR CEMENTING MATERIALS (ITEMS NOS. 5 and 6). BIDS SHOULD BE SUBMITTED FOR ONE ALTERNATE ONLY. IF BIDS ARE SUBMITTED FOR MORE THAN ONE ALTERNATE, THE GOVERNMENT WILL CONSIDER ONLY THE LOWEST BID. | | | | |
| | ALTERNATE NO. 1 (BID ONLY ONE ALTERNATE) | | | | |
| 5. | PORTLAND CEMENT | 100,800 | CWT | 3.00 | $ 302,400 |
| | ALTERNATE NO. 2 (BID ONLY ONE ALTERNATE) | | | | |
| 6. | PORTLAND CEMENT (USED WITH POZZOLAN CLASS F) | | | | |
| | PORTLAND CEMENT | 80,640 | CWT | | $ |
| | POZZOLAN, CLASS F | 10,256 | C.F. | | $ |
| 7. | WATER–REDUCING ADMIXTURE (USED WITH BOTH ALTERNATE NO. 1 & 2) | | | | |
| | a) Mobilization and Demobilization of Storage, Batching and Recording Equipment | 1 | JOB | L.S. | $ 50,000 |
| | b) Water-Reducing Admixture | 19,200 | C.Y. | .30 | $ 5,760 |
| | TOTAL | | | | $6,445,360 |

## SECTION 1C

### MEASUREMENT AND PAYMENT

1. GENERAL: The contract price for each item shall constitute full compensation for furnishing all plant, labor, materials, appurtenances, and incidentals and performing all operations necessary to construct and complete the items in accordance with these specifications and the applicable drawings, including surveying performed by the Contractor. Payment for each item shall be considered as full compensation, notwithstanding that minor features may not be mentioned herein. Work paid for under one item will not be paid for under any other item. No separate payment will be made for the work, services, or operations required by the Contractor, as specified in Sections SUPPLEMENTARY REQUIREMENTS, ENVIRONMENTAL PROTECTION, and CONSTRUCTION QUALITY CONTROL, to complete the project in accordance with these specifications; all costs thereof shall be considered as incidental to the work.

2. MEASUREMENT:

2.1 Cubic Yard Measurement: Measurement shall be to the nearest cubic yard. Computation of volume shall be by average-end area cross-sectional methods. No measurements for payment shall be made for excavation beyond designated limits.

2.1.1 Excavation will be measured between the original ground line after clearing and grubbing and the lines and grades shown or lines established under the direction of the Contracting Officer.

2.1.2 Satisfactory borrow material will be measured at the borrow site between the original ground line, after clearing and grubbing and removal of dark organic silty sandy gravel, and the surface of the borrow area after excavation has been completed.

2.2 Portland Cement: The quantity of portland cement to be paid for will be the number of short CWT (100 pounds) of portland cement actually used in the completed and accepted pavements. No pavement will be made for wasted cement nor for cement used for the convenience of the Contractor. The quantity to be paid for will be determined by multiplying the specified batch weight of portland cement used in the various approved concrete mixtures by the number of batches of the various concrete mixtures placed within the completed and accepted pavement and dividing by 100.

2.3 Pozzolan: The quantity of pozzolan paid for will be the number of cubic feet solid volume of pozzolan used unless specifically excepted, wasted or used for the convenience of the Contractor. The quantity to be paid for will be determined by multiplying the theoretical batch weight of pozzolan in each type of concrete used by the number of batches of concrete of the types placed within the pay lines of the pavement structure and dividing by the product of the average specific gravity of the pozzolan multiplied by 62.4 pounds per cubic foot. The average specific gravity shall be the average of the test results for all material accepted during the period covered by the payment. Payment shall be made at the contract price per cubic foot solid volume for the schedule item which

price shall include the cost of required unloading, hauling, handling, and storage at the site of all pozzolan used in the work.

2.4 <u>Water–Reducing Admixture</u> will be measured on a cubic yard basis for the actual volume of pavement concrete, containing a water-reducing admixture, that is placed as shown.

3. PAYMENT:

3.1 <u>First and Second Attack Helicopter Battalions Hangar Complete to a Line 5 Feet Outside the Building Walls, Except Items Nos. 3 through 7</u>: Payment will be made at the contract lump sum price for Item No. 1, First and Second Attack Helicopter Battalions Hangar complete to a Line 5 Feet Outside the Building Walls, Except Items Nos. 3 through 7, payment of which shall constitute full compensation for Item No. 1, complete.

3.2 <u>Sitework and Utilities Outside the Line 5 Feet Outside the Building Walls, Except Items Nos. 3 through 7</u>: Payment will be made at the contract lump sum price for Item No. 2, Sitework and Utilities Outside the Line 5 Feet Outside the Building Walls, Except Items Nos. 3 through 7, payment of which shall constitute full compensation for Item No. 2, complete.

3.3 <u>Excavation</u>: Payment will be made at the contract unit price for Item No. 3, Excavation, payment of which shall constitute full compensation for the excavation, loading, transporting unsatisfactory materials to waste area, and placing unsatisfactory materials as directed in the waste area; and for excavation, stockpiling, placing, and compacting satisfactory materials in fill areas. Excavation and backfilling for building footings will be paid for under Item No. 1.

3.4 <u>Satisfactory Borrow Material</u>: Payment will be made at the contract unit price for Item No. 4, Satisfactory Borrow Material, payment of which shall constitute full compensation for performance of all work required for excavating, loading, and transporting the borrow material to the fill areas and placing and compacting in the fill areas.

3.5 <u>Portland Cement</u>: The quantity of portland cement determined as specified above will be paid for at the contract unit price, which includes all costs of handling, hauling, and storage at the site.

3.6 <u>Pozzolan</u>: The quantity of pozzolan determined as specified above will be paid for at the contract unit price, which includes all costs of delivery, handling, and storage.

3.7 <u>Water-Reducing Admixture</u>: Water-reducing admixture will be paid for under items No. 7a and 7b. Mobilization and demobilization of storage, batching, and recording equipment, and any incidental cost related to testing and approval will be paid for at the contract lump sum price for Item Mobilization and Demobilization of Storage, Batching, and Recording Equipment, payment of which shall be considered full compensation, including all related labor. Payment will be prorated at 60 percent for mobilization and 40 percent for demobilization. Payment for the water-reducing admixture therefor will be made at the contract unit price for Item 7b Water-Reducing Admixture, payment of which shall constitute full compensation for the water-reducing admixture in concrete containing the water-reducing admixture measured as specified.

\* \* \*

16.4 <u>Cold Weather Requirements</u>: Special protection measures, approved by the Contracting Officer, shall be used if freezing temperatures are anticipated before the expiration of the specified curing period. The ambient temperature of the space adjacent to the concrete placement and surfaces to receive concrete shall be maintained at not less than 40 degrees F. The temperature of the concrete when placed shall be not less than 50 degrees F. nor more than 75 degrees F. Heating of the mixing water or aggregates will be required to regulate the concrete placing temperature. Materials entering the mixer shall be free from ice, snow, or frozen lumps. Salt, chemicals, or other materials shall not be incorporated in the concrete to prevent freezing. Upon written approval, calcium chloride may be used as an accelerator. The amount shall not exceed 2 percent by weight of the cement, and it shall be batched in solution form. Any concrete damaged by inadequate protection or procedure shall be removed and replaced at no additional cost to the Government.

16.5 <u>Warm Weather Requirements</u>: Concrete placed during warm weather shall have the lowest temperature practicable to produce under the conditions. The temperature of the concrete as placed shall not exceed 85 degrees F., except where an approved retarder is used. The mixing water and/or aggregates shall be cooled, if necessary, to maintain a satisfactory placing temperature. In no case shall the placing temperature exceed 90 degrees F.

17. TREATMENT OF FORMED SURFACES: Within 24 hours after forms are removed, suface defects shall be remedied as specified herein. For permanently exposed surfaces, fins shall be removed and holes left by removal of tie rods shall be reamed and filled by dry packing. For all surfaces, honeycomb and other defective areas shall be cut back to sound concrete and to a depth of not less than 1 inch. The edges of the cut shall be perpendicular to the surface of the concrete. The prepared area shall be dampened and brush-coated with neat cement grout. The repair shall then be made using a stiff mortar, preshrunk by allowing the mixed mortar to stand for 45 minutes, and then remixed thoroughly tamped into place; in lieu of hand patching, a small shotcrete gun may be used. Patches shall be finished flush with adjacent surfaces. For surfaces permanently exposed to view, the cement shall be a blend of job cement with white cement proportioned so that the final color after curing will be the same as the adjacent concrete. The temperature of concrete, mortar patching material, and ambient air shall be above 50 degrees F while making the repair and during the ensuing 72-hour, moist-curing period. Concrete with excessive honeycombing or other defects which affect the strength of the member will be rejected or the defects shall be corrected as directed by the Contracting Officer.

18. FLOOR SLABS ON GRADE:

18.1 Vapor Barrier: Immediately before placing concrete, the granular capillary water barrier or subgrade under slabs in buildings shall be covered with a vapor barrier, unless membrane water-proofing is indicated. Punctures and tears during subsequent operations shall be patched. Edges shall be lapped not less than 4 inches and ends not less than 6 inches. Patches and lapped joints shall be sealed with a pressure-sensitive adhesive or pressure-sensitive tape, not less than 2 inches wide and compatible with the membrane. The Contractor may construct the hangar floor slabs in accordance with the requirements of Section 2I: Concrete pavements for airfields.

