## BOWERS HYDRAULIC DREDGING COMPANY *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 9. Argued November 11, 1908.—Decided November 30, 1908.

Where words used in a contract are plain and unambiguous, expert testimony, as to their commercial signification, is not admissible for the purpose of destroying the plain and obvious intendment of a contract; and so held that where a Government dredging contract by its terms expressly excluded material which slid into the excavation from the slope outside of the stakes, expert testimony to show that the trade meaning of the words "measured in place" includes such sliding material if dredged was properly excluded.

After the Government has, against the contractor's protest, affixed a meaning to terms used in a contract, the contractor cannot reassert the same claim in regard to a supplementary contract for additional work of the same nature even if the original contract were susceptible of the construction claimed by him.

41 C. Cl. 214, 498, affirmed.

THE facts are stated in the opinion.

*Mr. L. T. Michener,* with whom *Mr. W. W. Dudley* and *Mr. P. G. Michener* were on the brief, for appellant:

The language of the contract is plain. The decision of the engineer in charge was required; not the decision of the chief of the corps; not the decision of the Secretary of War; not obedience to instructions. *Mansfield &c. R. Co.* v. *Veeder,* 17 Ohio, 204, 385; *Baldwin's Case,* 15 C. Cls. 297, 303; *King's Case,* 37 C. Cls. 428; *Kendall* v. *United States,* 12 Pet. 524, 608.

The power vested in the engineer in charge was such that he could not delegate it, nor could any one else, assume it, no matter how high his station, nor could it be discharged by a subordinate. *Archer* v. *Williamson,* 2 Harris & Gill (Md.), 62; *Wilson* v. *York &c. R. Co.,* 11 Gill & J. (Md.) 59, 72; *Weeks* v. *Boynton,* 37 Vermont, 297; *Eastern R. Co.* v. *Eastern Union R. Co.,* 68 Eng. Ch. 463; *Lingnood* v. *Eade,* 2 Atk. 501; *Proctor* v. *Williams,* 8 C. B. (N. S.) 386; *Whitmore* v. *Smith,* 5 H. & N. 824; *Little* v. *Newton,* 2 Scott N. R. 509.

The engineer in charge had the right to ask information from disinterested persons, but not from his superior officers, for they were not disinterested. *Soulsby* v. *Hodson*, 3 Burr. 1474; *Caledonia Ry. Co.* v. *Lockhart*, 3 Macq. 808; *Anderson* v. *Wallace*, 3 Cl. & Fin. 26; *Eads* v. *Williams*, 3 DeG., M. & G. 674; *Hopcraft* v. *Hickman*, 3 L. J. Ch. 43.

If the engineer officer proceeded upon a wrong or mistaken interpretation of the contract, the court will give relief, notwithstanding the provision that his decision shall be final. *Robertson* v. *Frank Brothers Co.*, 132 U. S. 17; *Lewis* v. *Chicago &c. R. R.*, 49 Fed. Rep. 708; *Alton R. R. Co.* v. *Northcott*, 15 Illinois, 49; *Starkey* v. *DeGroff*, 22 Minnesota, 431; *M. & G. R. R. Co.* v. *Veeder & Co.*, 17 Ohio, 385; *McAvoy* v. *Long*, 13 Illinois, 147; *Williams* v. *Chicago &c. Ry. Co.*, 112 Missouri, 463, 493–495; *Herrick* v. *Ver. Cent. R. Co.*, 27 Vermont, 673; *Kidwell* v. *B. & O. R. R. Co.*, 11 Gratt. 376; *Kistler* v. *I. & St. L. R. Co.*, 88 Indiana, 460; *Beckwith Case*, 38 C. Cls. 295, 314.

In performing the functions conferred by such stipulations, the engineer must have strict regard to the terms of the contract. His duties are to be ascertained from it, and his powers are limited to what it confers, or clearly implies. He cannot go beyond it nor behind it. His powers are not to be enlarged by implication beyond the plain words used. *Launman* v. *Younge*, 13 Pa. St. 306; *Williams* v. *Chicago Ry. Co.*, 112 Missouri, 466; *Sawtelle* v. *Howard* (Mich.), 62 N. W. Rep. 156.

In the case at bar, the engineer went beyond the contract and asked his superior officers to instruct him how to decide, although the sole power of decision was vested in him by the terms of the contract and specifications prepared and furnished by the United States and which are to be taken most strictly against the Government, liberality of construction being in favor of the contractor. *Edgar Thompson Works Case*, 34 C. Cls. 205, 219; *Chambers Case*, 24 C. Cls. 387.

The subject-matter of the controversy must be clearly within the contract or specifications to take away the rights

of the court or jury, and the engineer's determination will be conclusive only when clearly within the powers conferred upon him. *Sanders* v. *Hutchinson*, 26 Illinois, 633; *Mills* v. *Weeks*, 21 Illinois, 596; *Launman* v. *Younge*, 13 Pa. St. 306.

The engineer has no power to bind the parties when he goes beyond the terms of the contract or misinterprets it. *Starkey* v. *DeGroff*, 22 Minnesota, 431; *Alton R. R. Co.* v. *Northcott*, 15 Illinois, 49; *Grant* v. *Savannah R. Co.*, 51 Georgia, 348; *Kistler* v. *I. & St. L. R. Co.*, 88 Indiana, 460.

The engineer's decision or estimate is a conclusive adjudication only upon the condition that it is made according to the contract. *Drehew* v. *Altoona*, 121 Pa. St. 401; *Williams* v. *Chicago &c. Ry. Co.*, 112 Missouri, 463, 472, 473, 493–495; *The Beckwith case*, 38 C. Cls. 295, 299, 314.

The engineer should have determined the amount of the material excavated and removed by means of surveys made before and after dredging and by calculations based thereon.

When the contract provides that the engineer shall determine the amount of work, it does not give him the exclusive determination of the manner in which it shall be done according to contract. It does not give him the interpretation of the contract. *G. H. & S. A. Ry. Co.* v. *Henry*, 65 Texas, 685; *G. H. & S. A. Ry. Co.* v. *Johnson*, 74 Texas, 256; *Williams* v. *Chicago Ry. Co.* (Mo.), 20 S. W. Rep. 631.

The contractor may show that the engineer misconstrued the contract in his classifications of the work, and did not measure the work according to the contract, and he may show these things by evidence without alleging fraud. *Collins and Farwell case*, 34 C. Cls. 294, 332; *Beckwith case*, 38 C. Cls. 294, 299; *Williams* v. *Chicago Ry. Co.*, 112 Missouri, 463; *Lewis* v. *Chicago Ry. Co.*, 49 Fed. Rep. 708; *Summers* v. *Chicago Ry. Co.*, 49 Fed. Rep. 714; *Bridge Co.* v. *City of St. Louis*, 43 Fed. Rep. 768; *Lewis* v. *C. S. F. Ry. Co.*, 49 Fed. Rep. 708, 710.

The Government did not put language in the contract and specifications stating that material coming in from the sides should not be paid for.

There seems to be no reason why there should not be applied to the contract and the specifications here the principle so often applied to statutes by this court, that if Congress desires to grant a given power, right or authority, it says so in express terms; and where it does not say so, the conclusion is that it did not intend to give any such power. *Tillson* v. *United States,* 100 U. S. 46; *Vicksburg R. R. Co.* v. *Dennis,* 116 U. S. 669; *United States* v. *Chase,* 135 U. S. 259.

The principles of interpretation are very similar, whether applied to contracts, to deeds, or to statutes. 2 Parsons on Cont., side p. 494.

The Court of Claims should have considered and given due weight to the evidence about the trade meaning of the words "measured in place," and should have found the technical or trade meaning of the words in connection with the other language of the specifications; evidence as to the meaning of those words and specifications was admissible and should have been considered by the court. 2 Parsons on Cont. (7th ed.), side pp. 555, 556; 1 Greenleaf on Ev. (14th ed.), § 280; 1 Elliott on Ev., § 605; 4 Wigmore on Ev., §§ 2458–2467; 1 Starkie on Ev., side pp. 653, 701; Jones on the Const. of Com. and Trade Contracts, §§ 62, 204.

See rule as stated by Mr. Justice Campbell in *Garrison* v. *Memphis Ins. Co.,* 19 How. 312, 313.

*Mr. Assistant Attorney General John Q. Thompson,* with whom *Mr. Philip M. Ashford,* Special Attorney, was on the brief, for appellee:

The construction or interpretation of the contract is the ascertainment of the intention of the parties as expressed therein. 17 Am. & Eng. Ency. L. (2d ed.), 2; Jones on the Const. of Com. and Trade Contracts, 1; Anderson's Law Dictionary, 240.

The very idea and purpose of construction implies a previous uncertainty as to the meaning of the contract, for where this is clear and unambiguous there is no room for construction and

nothing for construction to do. 2 Parsons, 9th ed., 655; 17 Am. & Eng. Ency. of Law, 4; 21 Am. & Eng. Ency. of Law, 1109; Jones on Construction, etc., 31, 111, 237, 267; *Moran* v. *Prather*, 23 Wall. 492, 500; *Culber* v. *Wilkinson*, 145 U. S. 205, 212; *Iron World* v. *Cottrell*, 31 Fed. Rep. 254, 256.

The first duty of the trial court in the case at bar in considering the question of the admissibility of the expert testimony offered was to examine the contract with a view of discovering whether or not there was any ambiguity, patent or latent, therein, or any uncertainty or doubt as to the meaning of any of its terms or provisions, and, none being found, it was both proper and right to exclude said testimony.

The first duty of the court was to give force and effect to the contract as written, if possible.

On the other hand, if the court, upon such examination of the contract, should be in doubt as to the meaning of any of its terms or provisions, it might then proceed to apply the well-known rules of construction, among which, though not of first importance, is the rule that expert testimony may be admitted to explain the trade, or technical, meaning of words or phrases.

But an examination of the contract which is the subject of controversy herein shows that its language is so plain and unambiguous as to leave no room for construction or interpretation, nor for the introduction of evidence as to the trade meaning of any of its terms and provisions, and the Court of Claims properly so decided.

MR. JUSTICE WHITE delivered the opinion of the court.

The appellant, the dredge company, sued to recover $28,321.76. The relief sought was based on the averment that under a contract for dredging a channel, in the Christiana River and in or about the harbor of Wilmington, Delaware, made in 1899, and a supplementary contract made in June, 1901, the dredge company had excavated 260,430 cubic yards

of earth, for which, at the contract price, it should have been paid the sum sued for, but that the United States, in making settlement under the contract, despite the protest of the dredge company, had declined to pay, upon the ground that excavating and removing the earth referred to was not within the contract. The pertinent facts found by the court below are these (41 C. Cl. 214, 498):

Prior to September, 1899, the United States was engaged in excavating a channel in the Christiana River and about the harbor of Wilmington, Delaware. The work, in September, 1899, was in process of execution, under a contract between the United States and the New York Dredging Company. In the office of the United States engineer in charge of the work there existed maps or drawings showing the condition of the river prior to any work being done by the New York Dredging Company, the location of the channel in which the work was being done, and the specifications controlling the contract, as well as the progress made in the work. Of these facts the dredge company had knowledge. On September 18, 1899, the United States engineer office at Wilmington, through William F. Smith, United States agent, advertised for proposals for the dredging and removing of about nine hundred thousand cubic yards of material in connection with the work then being done, as previously stated. In the advertisement inviting the proposals it was stated that specifications, blank forms for proposals, and all available information would be furnished on application to the engineer office. The specifications for the work in question recited:

"The project, for the completion of which contracts are authorized in the law above quoted, requires the dredging of the Christiana River to a depth of 21 feet at mean low water from the 21-foot curve in the Delaware River to the upper line of the pulp works; thence to the draw pier of the Shellpot branch, No. 4, of the P., W. & B. R. R., so as to give a depth which gradually diminishes to 10 feet at mean low water at the latter-named place and the removal of shoals having less

than seven (7) feet of water over them; thence to Newport—
the width to be 250 feet to the mouth of the Brandywine,
200 feet thence to the upper line of the pulp works, and 100
feet above. Work is now in progress under contracts for
dredging to a depth of 18 feet up to the pulp works, the width
to be made being 200 feet, and for all above-described dredging
above the pulp works. The work required under these specifi-
cations is the dredging that remains to complete the project
additional to that done or to be done under the contracts
above referred to until their termination or completion. It is
estimated that about 900,000 cubic yards will have to be re-
moved."

The character of the work required, the method of carrying
on the same and the steps to be taken to fix the amount to
become due under the contract when fully performed were
stated in the specifications as follows:

"The amount of material removed will be paid for by the
cubic yard measured in place, and shall be determined by
surveys made before dredging is commenced and after it is
completed. All surveys and measurements are to be made
under the direction of the engineer in charge by persons em-
ployed by him for that purpose. The decision of the engineer
in charge as to the amount of material excavated and removed,
as well as to its location and deposit, shall be final and with-
out appeal on the part of the contractor.

"The location of the work shall be plainly located by stakes
and ranges. The level of mean low water as established by
the engineer in charge shall not be changed during the progress
of the work. The contractor shall be required to supply the
lumber for the necessary stakes and ranges, and shall at all
times when called upon furnish men and boats to set them
and keep them set under the direction of the inspector, the
expense thereof to be included in the contract price for the
dredging.

"No guarantee is given as to the nature of the bottom, but
as far as it is known it is sand, mud, clay, and gravel. Bidders

are requested to satisfy themselves upon this point and to examine all other local conditions, as it will be assumed that their bids are based upon personal information. No extra allowance will be made for excavating material differing from that herein described.

· "It is understood and agreed that the quantities given are approximate only, and it must be understood that no claim will be made against the United States on account of any excess or deficiency, absolute or relative, in the same. Bidders are expected to examine the drawings, and are invited to make the estimate of quantities for themselves. It is not expected that the actual quantities will vary more than 10 per centum from the estimates.

"Payments will be allowed for actual dredging to twenty-one (21) feet below mean low-water level. Work done outside of the designated lines of excavation or below the specified depth will not be paid for, and any material deposited otherwise than specified and agreed upon must be removed by the contractor at his own expense."

On November 20, 1899, the claimant (dredge company), whose proposal had been accepted, entered into a contract with the United States through General William F. Smith, United States agent, for the performance of the additional dredging, in conformity with the advertisements and specifications referred to in the preceding findings. It was provided in the contract that "the said Bowers Hydraulic Dredging Company shall furnish all labor, machinery and appliances necessary or proper for the faithful execution of the contract, and shall do the work called for, and in all respects carry out and comply with the said specifications for dredging." The sum to be paid was fixed by the contract at $10\frac{7}{8}$ cents for each and every cubic yard of material dredged, "measured in place," the said price including removal and redeposit.

Presumably, in consequence of knowledge on the part of the dredge company of a refusal by the Government to pay the New York Dredging Company for the work being done by

it for the removal of any earth from the excavated channel, derived from the sliding from slopes of the same, the dredging company, before commencing work, addressed a letter to General Smith, engineer in charge, requesting to know whether its contract would be construed as excluding payment for removing such earth. General Smith replied "that payment will be made for the quantity of material removed within the designated lines of excavation as determined by measurement before and after the dredging, and that such measurement does not include material which comes in from the sides during the progress of dredging." The letter stated: "I deem it proper to add that this is in conformity with the instructions received from the chief of engineers on the subject." The dredge company thereupon replied, protesting against this construction, declaring that it was not bound thereby, and that its performance of the work must not be construed as an acceptance of the correctness of such interpretation.

The work was commenced. Whenever a payment was made under the contract the dredge company, in receiving the same, asserted that it was entitled to be paid for removing any earth which had fallen into the excavation from the slopes and which had been removed by it, and on payment for such work being refused it protested. On June 21, 1901, while the work on the contract was proceeding, the dredge company made a supplementary contract, increasing the amount to be by it excavated, in accordance with the terms and specifications of the prior contract, from 900,000 to 1,300,000 cubic yards. As the work thereafter progressed under both contracts payments were continued to be made by the Government and received by the dredge company under protest, as before stated, until the work under the contracts was finally completed.

The court below found:

"The amount of material that fell or slid from the sides or slopes of the vertical walls in front of the dredge and that was removed thereby along with the excavated material within the

designated lines for dredging as provided by the contract, was more than 30,000 cubic yards, which, at the contract price of 10⅞ cents per cubic yard, would amount to over $3,000."

In the opinion delivered by the court below it was said:

"We are therefore of the opinion that the specifications, which are made part of the contract, are plain and unambiguous, and that they not only furnish the basis of *measurement in place* of the material to be excavated, but that the measurements made by the engineer in charge were in strict accord therewith. This being so, any other method of *measurement in place*, even though customary, is excluded by the terms of the contract, and, therefore, expert testimony is not admissible to explain language that needs no explanation."

And for these reasons the right of the dredge company to recover was denied. A new trial was asked, among others, on the ground that error had been committed in not finding the trade meaning of the words, "measured in place," and because the amount of cubic yards of earth which had slid in from the sides or slopes of the excavation while the contract was being performed, and which had been removed by the company, had not been fixed at 260,430 instead of "as above 30,000," as stated in the findings. In addition a request was made that the findings be amended so as to qualify the finding that the price paid should be 10⅞ cents for each and every cubic yard of material dredged, measured in place, by adding the words, "the same being the trade meaning or understanding of the words 'measured in place.'" In addition it was asked that the finding as to the amount of cubic yards removed of matter that fell from the sides or slopes be increased from above 30,000 to 260,430. The motion for a new trial and the motion to amend the findings were overruled. The court, in its reasons for denying the motion, while stating that certain expert testimony had been offered as to the meaning ·of the words "measured in place," further stated that it had declined to consider the same and make a finding thereon,

as it concluded, as said in its previous opinion, that the import of the words "measured in place," as used in the contract, was so free from ambiguity that it did not consider the testimony relevant. This was based upon the opinion that whatever might be the commercial signification of the words that meaning could not be imported into the contract for the purpose of destroying its plain and obvious intendment when the terms of the entire contract and the specifications forming part of the same were given their proper weight.

The errors complained of are all embraced under the following headings:

*a.* The refusal of the court to receive and consider testimony offered as to the trade meaning of the words "measured in place" and its refusal to make a finding on the subject. It being contended that the action of the court in refusing to amend its findings and the statement, in its opinion, that it declined to consider such testimony, adequately preserves the question for review.

*b.* The refusal of the court to find the precise amount removed of earth which slid in from the sides or slopes, thus leaving the finding uncertain on that subject.

*c.* The attributing of conclusive efficacy to the action of the officer in charge.

And finally,

*d.* The construction given by the court to the contract.

It is apparent that the question of construction last stated lies at the foundation of all the assignments, and therefore first commands consideration. We say this because if it be that the court below was correct in its conclusion that the contract gave to the words "measured in place," as therein used, a plain and unambiguous signification, it is obvious that the abstract or commercial meaning of those words, upon the hypothesis that they have such meaning, was rightly held to be irrelevant. And it is equally plain that if the court below rightly construed the contract in the particular mentioned it will be unnecessary to consider the effect which was given

to the action of the officer in charge, since that action was in accordance with the meaning which the court gave to the contract.

Coming to consider the contract, we are of opinion that the court below correctly enforced its self-evident meaning. The requirement that the amount of material removed should be paid for by the cubic yard measured in place, and should be determined by surveys made before dredging is commenced and after its completion, clearly in and of itself established a method for fixing the amount of material which might be excavated, and which was to be paid for, absolutely incompatible with the contention that the contract contemplated that payment should be made for excavated earth which might slide into the channel from the slopes of the same during the progress of the work. And this is fortified by the requirement as to the location of the stakes and the keeping of them continually in place during the performance of the work under the contract. It is, moreover, additionally sustained by the provision, "that no extra allowance will be made for excavating material different from that herein prescribed," and by the stipulations, "that work done outside of the designated lines of excavations or below the specified depth will not be paid for," and "that any material deposited other than that specified and agreed upon must be removed by the contractor at his own expense." When these provisions are read in connection with the specification stating that "no guarantee is given as to the nature of the bottom, but, as far as it is known, it is sand, mud, clay and gravel, bidders are requested to satisfy themselves as to this point, and to examine all other local conditions, as it will be assumed that their bids are based upon personal information" in connection with the statement of the approximate quantity, and the further condition that "no claim will be made against the United States on account of any excess or deficiency, absolute or relative in the same," we think the conclusion is beyond reasonable controversy that the contract, by its express terms and without ambiguity, ex-

cludes the possibility of holding that earth which might slide
from the slopes during the excavation was to be paid for by the
United States. To separate the words "measured in place"
from all the other provisions of the contract in order to give
them an assumed or proven abstract trade meaning repug-
nant to their significance in the contract would be to destroy
and not to sustain and enforce the contract requirements.
Lest our silence upon the subject may give rise to misconcep-
tion, we deem it well to observe that even if the original con-
tract was susceptible of a different construction from that
which we hold arises from its plain import, such result could
have no possible influence on the asserted claim of the dredge
company, in so far as that claim is based upon excavation done
under the supplementary contract. We say this because that
contract was made with the full knowledge of the meaning
affixed by the United States to the terms of the contract, and
which had been insisted upon in the carrying on of the previous
dredging operations.

*Affirmed.*