**Mark LEVY, Derivatively on behalf of Immunogen Inc., Plaintiff–Appellant,**

v.

**SOUTHBROOK INTERNATIONAL INVESTMENTS, LTD.,**
Defendant–Appellee.

and

**Immunogen, Inc., Nominal–Defendant–Appellee.**

No. 00–7630.

United States Court of Appeals, Second Circuit.

Argued Dec. 14, 2000.

Decided Aug. 23, 2001.

Jeffrey S. Abraham, Law Office of Jeffrey S. Abraham, New York, NY, for Appellant.

Herbert Teitelbaum, Peter Sapanoff, Noah Weissman, Robinson Silverman Pearce Aronsohn & Berman LLP, New York, NY, for Appellee.

Allan A. Capute, Eric Summergrad, Meyer Eisenberg, David M. Becker, General Counsel, for the Securities and Exchange Commission, Amicus Curiae.

Before: FEINBERG, PARKER, Circuit Judges, and COVELLO, District Judge.*

PARKER, Circuit Judge:

Plaintiff-appellant, Mark Levy ("Levy"), is a shareholder of ImmunoGen, Inc ("ImmunoGen"). He brings this shareholder derivative action alleging that defendant, Southbrook International Investment, Ltd. ("Southbrook"), by virtue of its ownership of ImmunoGen convertible preferred shares, is a more than 10% beneficial owner of ImmunoGen common stock and realized short swing profits through the purchase and sale of ImmunoGen stock within a six month period. Plaintiff-appellant seeks disgorgement of Southbrook's profits as required by Section 16(b) of the

---

\* The Honorable Alfred V. Covello, Chief Judge of the United States District Court for the District of Connecticut, sitting by designation.

Securities and Exchange Act of 1934 as amended, 15 U.S.C. § 78p(b) ("the Exchange Act").

Article III, Paragraph 3.10 ("the conversion cap") of the Convertible Preferred Stock Purchase Agreement between ImmunoGen and Southbrook ("the Agreement") provides that Southbrook may not convert shares to the extent that such conversion would result in Southbrook owning more than 4.9% of ImmunoGen's outstanding common stock.

There is no claim that Southbrook ever exceeded the conversion cap. Rather, plaintiff-appellant claims that due to Southbrook's ability to make limited conversions and sales over a sixty-day period it could have cumulatively owned more than 10% of ImmunoGen's common stock within the meaning of 17 C.F.R. § 240.13d–3(a) and 13d–3(d)(1)(i) ("Rules 13d–3(a) and 13d–3(d)(1)(i)," respectively). Therefore, according to plaintiff-appellant, Southbrook is a more than 10% beneficial owner within the meaning of Section 16(b) and subject to Section 16(b) short-swing trading liability.

In the alternative, plaintiff-appellant contends that:

(1) the Agreement is void as a "sham transaction"; (2) the conversion limitation provision is void pursuant to 17 C.F.R. § 240.13d–3b ("Rule 13d–3(b)"); [1] and (3) the conversion limitation constitutes a waiver of section 16(b), and therefore is void pursuant to Section 29(a) of the Exchange Act as amended, 15 U.S.C. § 78cc(a). [2]

Southbrook counters that, because the conversion cap prevents Southbrook from owning, at any one point, more than 4.9% of ImmunoGen's common stock, Southbrook is not a more than 10% beneficial owner within the meaning of Rules 13d–3(a) and 13d–3(d)(1)(i), and consequently, is not subject to Section 16(b) short-swing trading liability. Additionally, according to Southbrook, because the conversion cap is valid and binding, plaintiff-appellant's alternative grounds for relief are inapplicable.

We conclude that where a binding conversion cap denies an investor the right to acquire more than 10% of the underlying equity securities of an issuer, at any one time, the investor is not, by virtue of his or her ownership of convertible securities, the beneficial owner of more than 10% of those equity securities within the meaning of Rules 13d 3(a) and 13d–3(d)(1)(i). We further find that the conversion cap in this case is binding, and accordingly, affirm the decision of the district court.

## I. BACKGROUND

The allegations in the complaint disclose the following. On October 16, 1996 Southbrook and ImmunoGen entered into the Agreement. Pursuant to the agreement Southbrook agreed to purchase Immunogen convertible preferred stock. The

---

1. Rule 13d–3(b) reads as follows:
Any person who, directly or indirectly, creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement, or device with the purpose of [sic] effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d) or (g) of the Act shall be deemed for purposes of such sections to be the beneficial owner of such security.
17 C.F.R. § 240.13d–3(b).

2. 15 U.S.C. § 78cc(a) reads as follows: "Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void." 15 U.S.C. § 78cc(a).

Agreement limits Southbrook's ability to convert the preferred stock to the extent that such conversion would result in Southbrook owning more than 4.9% of the common stock, at any one time. The conversion cap in part reads as follows:

> 3.10 *Purchaser Ownership of Common Stock*. The Purchaser may not use its ability to convert Shares hereunder or under the terms of the Vote Certificates or to exercise its right to acquire shares of common stock under the Warrants to the extent that such conversion or exercise would result in the Purchaser owning more than 4.9% of the outstanding shares of the Common Stock.

Joint App. at 36 (Convertible Preferred Stock Purchase Agreement, ¶ 3.10).

Plaintiff-appellant alleges that by February 21, 1997, Southbrook was a more than 10% beneficial owner of ImmunoGen's outstanding common stock by virtue of Southbrook's ownership of ImmunoGen convertible preferred stock. The complaint further alleges that between January 1 and February 4, 1997, Southbrook acquired ImmunoGen common shares through conversion and sold them presumably at a profit. Southbrook allegedly repeated this process between January 27 and August 4, 1997, and again in October 1997.

On December 28, 1998, plaintiff-appellant demanded that ImmunoGen's Board of Directors bring an action to cause Southbrook to disgorge its alleged, short swing profits. *See Levy v. Southbrook International Investments, Ltd.*, No. 99 Civ. 1480 NRB, 2000 WL 567008, at *2 (S.D.N.Y. May 10, 2000). By letter dated February 18, 1999, the Board refused, and this suit followed. *See id.*

Plaintiff-appellant, Mark Levy, derivatively on behalf of ImmunoGen, brought this action for disgorgement pursuant to Section 16(b) of the Exchange Act, claiming that Southbrook improperly profited from its investment in ImmunoGen because it was a more than 10% beneficial owner of ImmunoGen's common stock. *See id.* at *1. Southbrook filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim, on the ground that the conversion cap prevented it from being a more than 10% beneficial owner of ImmunoGen common stock. *See id.* Southbrook's motion to dismiss was accompanied by an affidavit and copies of various documents referred to in the complaint.[3]

The district court, in a written opinion, granted Southbrook's motion to dismiss. *See id.* It found plaintiff-appellant's beneficial ownership argument inconsistent with precedent in this Circuit. *See id.* (citing *Levner v. Saud*, 903 F.Supp. 452 (S.D.N.Y.1994), *aff'd, Levner v. Prince Alwaleed*, 61 F.3d 8 (2d Cir.1995)). Additionally, the district court concluded that "it is clear that only those holders of derivative securities, who could acquire ownership, by conversion or otherwise, of more than 10% of the common stock, *at one time*, are subject to § 16(b) liability." *Id.* at *10 (emphasis in original).

Finally, in response to plaintiff-appellant's alternative grounds for relief, the district court held that: (1) because conversion caps are legitimate the sham transaction doctrine was inapplicable; (2) since there was no plan or scheme to

---

**3.** We note that it was appropriate for the district court to refer to the documents attached to the motion to dismiss since the documents were referred to in the complaint. *See Yak v. Bank Brussels Lambert, BBL (USA) Holdings Inc.*, 252 F.3d 127, 130 (2d Cir. 2001) ("On a motion to dismiss, the court may consider any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference.") (citation and internal question marks omitted).

evade, and the plaintiff did not allege such in his complaint, the conversion cap was not void pursuant to Rule 13d–3(b); and (3) Section 29(a) applied only to express waivers of non-compliance, and there was no such waiver here. *See id.* at *4–5.

Plaintiff-appellant filed a timely notice of appeal on May 17, 2000. On appeal, he challenges the district court's grounds for dismissing his complaint. After hearing oral argument in this case on December 14, 2000, the panel requested and received an amicus curiae brief from the Securities and Exchange Commission which provided support for defendant-appellee's position.

## II.  DISCUSSION

This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

■■■ We review a district court's dismissal of a complaint pursuant to Fed. R.Civ.P. 12(b)(6) de novo. *See Feder v. Frost,* 220 F.3d 29, 32 (2d Cir.2000). Issues of statutory interpretation are also reviewed de novo. *See United States v. Proyect,* 989 F.2d 84, 87 (2d Cir.1993). Although on a motion to dismiss a court must accept all factual allegations as true and draw all inferences in the plaintiff's favor, *see Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994), dismissal is appropriate if the plaintiff can prove no set of facts that would entitle him to relief. *See Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998).

Additionally, this Court is "bound by the SEC's interpretations of its regulations in its amicus briefs, unless they are plainly erroneous or inconsistent with the regulation[s]," *Press v. Quick & Reilly, Inc.,* 218 F.3d 121, 128 (2d Cir.2000) (citation and internal quotation marks omitted).

■■■ Section 16(b) of the Exchange Act compels corporate insiders to disgorge profits earned on purchases and sales of securities made within six months of each other. *See* Securities and Exchange Act of 1934 § 16(b), 15 U.S.C. § 78p(b). "[L]iability under § 16(b) does not attach unless the plaintiff proves that there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a *shareholder who owns more than 10% of any one class of the issuer's securities* (4) within a six month period ." *Gwozdzinsky v. Zell/Chilmark Fund, L.P.,* 156 F.3d 305, 308 (2d Cir.1998) (emphasis added). In other words, only officers, directors, and persons who beneficially own more than 10% of an issuer's common stock are subject to Section 16(b) short swing trading liability. Inasmuch as Southbrook is neither an officer nor a director of Immuno-Gen, Section 16(b) liability can attach only if it is a more than 10% beneficial owner. Therefore, the issue presented is whether Southbrook, despite the existence of the 4.9% conversion cap, is a more than 10% beneficial owner of ImmunoGen's common stock.

*An Investor Subject to an Effective, Binding Conversion Cap of 4.9% is Not a More Than 10% Beneficial Owner of the Underlying Equity Stock*

Section 16(b) does not define the term "more than 10% beneficial owner," but Rule 16a–1 promulgated thereunder provides that "for the purposes of determining whether a person is a beneficial owner of more than 10% of any class of equity securities ... the term 'beneficial owner' shall mean any person who is deemed a beneficial owner pursuant to Section 13(d) of the Act and the rules promulgated thereunder." *See* 17 C.F.R. § 240.16a–1(a)(1). Rule 13d–3, in turn, determines beneficial ownership. It states:

(a) For purposes of sections 13(d) and 13(g) of the Act a beneficial owner of a security includes any person who, direct-

ly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:

(1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or,

(2) Investment power which includes the power to dispose, or direct the disposition of, such security . . . .

(d) Notwithstanding the provisions of paragraphs (a) and (c) of this rule:

(1)(i) A person shall be deemed to be the beneficial owner of a security, subject to the provisions of paragraph (b) of this rule, if that person has the right to acquire beneficial ownership of such security, as defined in Rule 13d–3(a) (§ 240.13d–3(a)) within sixty days, including but not limited to any right to acquire: (a) Through the exercise of any option, warrant or right; (b) Through the conversion of a security, . . .

17 C.F.R. 240 § 13d–3(a) and (d)(1)(i).

As noted earlier, plaintiff-appellant argues that as a consequence of Southbrook's ability to dispose of more than 10% of ImmunoGen's common stock within sixty days through seriatum conversions and sales, Southbrook cumulatively had investment power over, and consequently was the beneficial owner of, more than 10% of ImmunoGen's common stock within the meaning of Rules 13d–3(a) and 13d–3(d)(1)(i). Southbrook responds that beneficial ownership depends on its right, at a given point rather than cumulatively over a sixty-day period, to acquire through conversion more than 10% of ImmunoGen's common stock.

The SEC's position, as set forth in its amicus brief to this Court supports defendant's reading of the Rule. According to the SEC, a holder of convertible securities that is subject to a binding conversion cap is not a more than 10% beneficial owner of the underlying equity securities. *See*

Brief of Amicus Curiae the Securities and Exchange Commission (No. 00–7630) at 14. "[T]he powers and rights one has must be evaluated as of the time of a transaction to determine whether one is required to file a report under Sections 13(d) and/or 16(a), and whether the transaction is subject to short-swing profit recovery under Section 16(b)." *Id.* at 20 (internal quotation marks omitted).

■ Pointing out that Rule 13d–3(d)(1)(i) speaks to the "right," not the "ability" to acquire, the SEC reasons that the investor's "right to acquire" stock is at all times subject to the conversion cap. *See id.* at 21. As long as an investor holds the maximum percentage of common shares allowed pursuant to the conversion cap, the investor does not have the "right to acquire" investment power over any of the convertible shares. *See id.* at 20–21. Only when the investor divests itself of sufficient shares of common stock to reduce holdings below the cap does any additional "right to acquire" come into being. *See id.* At that point the investor does not have voting power, investment power, or the "right to acquire" those powers, with respect to the divested shares. Nor does it have the "right to acquire" those powers by virtue of its conversion rights because the cap prohibits conversion so as not to exceed holdings in excess of 4.9% of the common stock. *See id.* Accordingly, the SEC reasons, the calculation of beneficial ownership is not cumulative. As we mention above, we are bound by the SEC's interpretation unless it is clearly erroneous or inconsistent with the regulation being interpreted. *See Press*, 218 F.3d at 128 (citation omitted).

Section 13(d) and the rules promulgated thereunder are reporting requirements intended to provide investors with early warnings of potential changes in control.

The SEC brief explains the application of the Section 13(d) definition of beneficial ownership to short-swing trading cases under Section 16(b). The beneficial ownership threshold established for disclosure of shareholder control under Section 13(d) is based on, at least in part, the power over corporate affairs associated with significant equity ownership. This power also implicates access to inside information and the potential for insider trading.

Upon adoption of the "within 60 day" language in the Rule the SEC said, "Rule 13d–3(d)(1)(i) deems a person to be the beneficial owner of a security if he has the right to acquire beneficial ownership of such security, at any time within sixty days, through: . . . (b) conversion of a convertible security . . ." *Filing and Disclosure Requirements Relating to Beneficial Ownership,* Exchange Act Release No. 14692, 14 SEC Docket 862, 1978 WL 14827 at *14 (April 21, 1978). It is obvious, given the purpose of the Rule, that the phrase "within sixty days" is intended to apply to the period within sixty days of a transaction which triggers the application of the Rule. The SEC also said that it was

> mindful that as the point in time in which the right to acquire may come to fruition is extended into the future the relation of the right's ability to influence control is correspondingly attenuated. When sixty days or less are left until the right to acquire may be exercised, the Commission believes that the ability of the holder of such right to affect control is sufficient to warrant the imposition of an obligation to file under Rule 13d–1.

*See id.* at *15.

This language suggests that the Commission was contemplating a time limitation in connection with the right to acquire the ability to control.

■ Viewing Rule 13d–3(d)(1)(i) in the context of its purpose, and operation, we find reasonable the SEC's reading of the Rule's "right to acquire" language. The SEC's use of "within sixty days" in Rule 13d–3(d)(1)(i) directs us to look not to the percentage of common shares cumulatively, beneficially owned during a 60 day period as plaintiff-appellant argues, but rather, to whether the "right to acquire" inures at some point within sixty days of the acquisition. In short, "within sixty days" is a timing limit, not a direction to aggregate. Thus, beneficial ownership is determined at any one time, not cumulatively. This interpretation is consistent with the Supreme Court's instruction that Section 16(b) operate only within "narrowly drawn limits." *Foremost–McKesson, Inc. v. Provident Securities Co.,* 423 U.S. 232, 251, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976). Moreover, this interpretation limits Section 16(b) short swing trading liability to those persons in a position to influence the value of stocks because they hold or have the "right to acquire", at any one time, more than 10% of the issuer's common stock. *See Morales v. Freund,* 163 F.3d 763, 766 (2d Cir.1999) (explaining that the object of 16(b) is to avoid short swing profits by investors that may be able to influence the value of stocks in which they trade).

■ Accordingly, as long as the conversion cap in this case is binding, Southbrook cannot be the beneficial owner of more than 4.9% of ImmunoGen stock. At any one time, it cannot hold more than that amount of stock because it does not have the "right to acquire" more than 4.9% of ImmunoGen common stock "within sixty days" of each divestment. Because the SEC's position is neither plainly erroneous nor inconsistent with the regulations and comports with our interpretation, we adopt it. *See Press,* 218 F.3d at 128.

We now address plaintiff-appellant's arguments concerning the validity of the conversion cap itself.

### B. *The Conversion Cap in This Case is Valid and Binding*

Plaintiff-appellant claims that the conversion cap in Paragraph 3 .10 of the Agreement is not valid and binding because (1) it does not actually bind the purchaser to maintain an equity holding below the 4.9% threshold and thus is void as a sham transaction; 2) the conversion limitation provision is void pursuant to Rule 13d–3(b); and 3) the conversion limitation constitutes a waiver of Section 16(b), and therefore is void pursuant to Section 29(a) of the Exchange Act.

The conversion cap in this case provides that:

> 3.10 *Purchaser Ownership of Common Stock.* The Purchaser may not use its ability to convert Shares hereunder or under the terms of the Vote Certificates or to exercise its right to acquire shares of common stock under the Warrants to the extent that such conversion or exercise would result in the Purchaser owning more than 4.9% of the outstanding shares of the Common Stock.
>
> The company shall, promptly upon its receipt of a Holder Conversion Notice tendered by the Purchaser (or its sole designee) under the Vote Certificates, and upon its receipt of a notice of exercise under the terms of any of the Warrants, notify the Purchaser by telephone and by facsimile of the number of shares of Common Stock outstanding on such date and the number of Underlying Shares and Warrant Shares which would

be issuable to the Purchaser (or its sole designee, as the case may be) *if the conversion requested in such Conversion Notice or exercise requested in such exercise notice* were effected in full, whereupon, notwithstanding anything to the contrary set forth in the Vote Certificates or the Warrants, the *Purchaser may within one Trading Day of its receipt of the Company notice required by this Section by telephone or by facsimile revoke such conversion or exercise* to the extent that it determines that such conversion or exercise would result in the Purchaser owning in excess of 4.9% of such outstanding shares of Common Stock.

Joint App. at 36–37 (Convertible Preferred Stock Agreement, 3. 10) (emphasis added).

Relying on the permissive "may" in the above provision, plaintiff-appellant argues that the Purchase Agreement is a sham [4] because Southbrook can, in its sole discretion, decide to own more than 4.9% of the common stock by simply not revoking the relevant exercise or conversion. Southbrook responds that, to the contrary, the above provision ensures compliance by permitting Southbrook to revoke any conversion to the extent that it would result in Southbrook owning more than 4.9% of ImmunoGen's stock.

■ We reject plaintiff-appellant's argument and instead agree with defendant-appellee. "A writing is interpreted as a whole." Restatement (Second) of Contracts § 202(2). "[T]he intention of the parties is not derived from sentences or clauses read in isolation, but from the instrument as a whole." *Sure–Trip, Inc. v. Westinghouse Engineering,* 47 F.3d 526,

---

4.  "When the limitations provided by conversion caps are discovered to be illusory or a sham, they should be disregarded and the courts should analyze the case as though no such limitations existed." Amicus at 25–26;

*see also Bershad v. McDonough,* 428 F.2d 693, 697 (7th Cir.1970) ("[t]he commercial substance of the transaction rather than its form must be considered, and courts should guard against sham transactions . . . .").

533 (2d Cir.1995). On the whole, the conversion cap effectuates a clear prohibition on Southbrook's ability to convert shares to the extent that conversion would result in it owning in excess of 4.9% of Immuno-Gen's outstanding common stock.

Additionally, the vote certificates provide that a conversion notice, once given, is irrevocable. In light of that provision, the clause relied on by plaintiff-appellant to prove that the conversion cap is a sham is properly interpreted as an exception to the irrevocability provision providing a means of ensuring compliance with the cap by granting Southbrook the ability to revoke a requested conversion to the extent that full exercise would exceed the cap. To separate the provisions of Paragraph 3.10 from each other and the other documents that constitute the parties' agreement "in order to give them an assumed or [ ] abstract [ ] meaning, repugnant to their significance in the contract, would be to destroy, and not to sustain and enforce, the contract requirements," and we decline to do so. *Bowers Hydraulic Dredging Co. v. United States,* 211 U.S. 176, 188, 44 Ct.Cl. 592, 29 S.Ct. 77, 53 L.Ed. 136 (1908).

Additionally, plaintiff-appellant's argument is defeated by the fact that Southbrook may divest in order to stay under the cap, and therefore, it does not have to revoke to remain in compliance with the conversion cap.

Finally, we find plaintiff-appellant's remaining arguments to be without merit for substantially the same reasons as stated by the district court.

### III. CONCLUSION

For the reasons set forth above, the judgment of the district court is AFFIRMED.