**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THE FACEBOOK, INC.; MARK
ZUCKERBERG,
               *Plaintiffs-Appellees,*

DIVYA NARENDRA; CAMERON
WINKLEVOSS; TYLER WINKLEVOSS,
               *Intervenors,*

          v.

PACIFIC NORTHWEST SOFTWARE,
INC.; WAYNE CHANG; WINSTON
WILLIAMS,
               *Defendants.*

No. 08-16745

D.C. No.
5:07-cv-01389-JW

6275

THE FACEBOOK, INC.; MARK
ZUCKERBERG,
          *Plaintiffs-Appellees,*

                    v.

CONNECTU, INC., FKA ConnectU,
LLC,

                    *Defendant-Appellee,*          No. 08-16873

                    and                            D.C. No.
                                                   5:07-cv-01389-JW
CAMERON WINKLEVOSS; TYLER
WINKLEVOSS; DIVYA NARENDRA,
          *Defendants-Appellants,*

                    and

PACIFIC NORTHWEST SOFTWARE,
INC.; WAYNE CHANG; WINSTON
WILLIAMS,
                    *Defendants.*

THE FACEBOOK, INC.; MARK
ZUCKERBERG,

       *Plaintiffs-Appellees,*

       v.

CONNECTU, INC., FKA ConnectU,
LLC,

       *Defendant-Appellee,*

       and

CAMERON WINKLEVOSS; TYLER
WINKLEVOSS; DIVYA NARENDRA,

       *Defendants-Appellants,*

       and

PACIFIC NORTHWEST SOFTWARE,
INC.; WAYNE CHANG; WINSTON
WILLIAMS,

       *Defendants.*

No. 09-15021

D.C. No.
5:07-cv-01389-JW

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
James Ware, District Judge, Presiding

Argued and Submitted
January 11, 2011—San Francisco, California

Filed April 11, 2011
Amended May 16, 2011

Before: Alex Kozinski, Chief Judge, J. Clifford Wallace and
Barry G. Silverman, Circuit Judges.

Opinion by Chief Judge Kozinski

**COUNSEL**

Jerome B. Falk (argued), Sean M. SeLegue, John P. Duchemin, Shaudy Danaye-Elmi and Noah S. Rosenthal, Howard Rice Nemerovski Canady Falk & Rabkin, San Francisco, California, for the defendants-appellants-cross-appellees.

E. Joshua Rosenkranz (argued), Orrick, Herrington & Sutcliffe LLP, New York, NY; I. Neel Chatterjee, Monte Cooper and Theresa A. Sutton, Orrick, Herrington & Sutcliffe LLP, Menlo Park, California; and Theodore W. Ullyot and Colin S. Stretch, Facebook, Inc., Palo Alto, California, for the plaintiffs-appellees.

James E. Towery, Alison P. Buchanan and Jill E. Fox, Hoge, Fenton, Jones & Appel, Inc., San Jose, California, for the defendant-appellee.

## ORDER

The opinion is amended as follows:

Page 4909,
Lines 20-24          Replace <The district court excluded this evidence under its Alternative Dispute Resolution (ADR) Local Rule 6-11, which it read to create a "privilege" for "evidence regarding the details of the parties' negotiations in their mediation."> with <The district court excluded this evidence under its Alternative Dispute Resolution (ADR) local rule on "confidential information," which it read to create a "privilege" for "evidence regarding the details of the parties' negotiations in their mediation." A local rule, like any court order, can impose a duty of confidentiality as to any aspect of litigation, including mediation. *See* N.D. Cal. ADR L.R. 6-12(a); *see also* 28 U.S.C. § 652(d).>

The petition for rehearing en banc is denied. *See* Fed. R. App. P. 35, 40. No further petitions for rehearing or rehearing en banc may be filed.

## OPINION

KOZINSKI, Chief Judge:

Cameron Winklevoss, Tyler Winklevoss and Divya Narendra (the Winklevosses) claim that Mark Zuckerberg stole the idea for Facebook (the social networking site) from them. They sued Facebook and Zuckerberg (Facebook) in Massachusetts. Facebook countersued them and their competing

social networking site, ConnectU, in California, alleging that the Winklevosses and ConnectU hacked into Facebook to purloin user data, and tried to steal users by spamming them. The ensuing litigation involved several other parties and gave bread to many lawyers, but the details are not particularly relevant here.

The district court in California eventually dismissed the Winklevosses from that case for lack of personal jurisdiction. It then ordered the parties to mediate their dispute. The mediation session included ConnectU, Facebook and the Winklevosses so that the parties could reach a global settlement. Before mediation began, the participants signed a Confidentiality Agreement stipulating that all statements made during mediation were privileged, non-discoverable and inadmissible "in any arbitral, judicial, or other proceeding."

After a day of negotiations, ConnectU, Facebook and the Winklevosses signed a handwritten, one-and-a-third page "Term Sheet & Settlement Agreement" (the Settlement Agreement). The Winklevosses agreed to give up ConnectU in exchange for cash and a piece of Facebook. The parties stipulated that the Settlement Agreement was "confidential," "binding" and "may be submitted into evidence to enforce [it]." The Settlement Agreement also purported to end all disputes between the parties.

The settlement fell apart during negotiations over the form of the final deal documents, and Facebook filed a motion with the district court seeking to enforce it. ConnectU argued that the Settlement Agreement was unenforceable because it lacked material terms and had been procured by fraud. The district court found the Settlement Agreement enforceable and ordered the Winklevosses to transfer all ConnectU shares to Facebook. This had the effect of moving ConnectU from the Winklevosses' to Facebook's side of the case.

The Winklevosses appeal.

**A.** Because ConnectU switched sides, it no longer had any interest in appealing the district court's order. The Winklevosses sought to intervene after the district court entered judgment enforcing the Settlement Agreement. The court denied the motion as unnecessary, holding that they were "already parties to the[ ] proceedings to enforce the Settlement Agreement" and "may appeal that Judgment." In fact, the Winklevosses had earlier been dismissed from the case. But, by ruling that they were "already" parties, the district court implicitly granted them intervention nunc pro tunc. *See Beckman Indus., Inc.* v. *Int'l Ins. Co.*, 966 F.2d 470, 474-75 (9th Cir. 1992). They therefore have standing to appeal. *See Marino* v. *Ortiz*, 484 U.S. 301, 304 (1988) ("[T]hose [litigants who] properly become parties[ ] may appeal an adverse judgment . . . .").

**B.** The Settlement Agreement envisioned that Facebook would acquire all of ConnectU's shares in exchange for cash and a percentage of Facebook's common stock. The parties also agreed to grant each other "mutual releases as broad as possible," and the Winklevosses represented and warranted that "[t]hey have no further right to assert against Facebook" and "no further claims against Facebook & its related parties."

Facebook moved to enforce the Settlement Agreement, and also asked the district court to order ConnectU and the Winklevosses to sign more than 130 pages of documents, including a Stock Purchase Agreement, a ConnectU Stockholders Agreement and a Confidential Mutual Release Agreement. Facebook's deal lawyers claimed that the terms in these documents were "required to finalize" the Settlement Agreement, and its expert dutifully opined that they were "typical of acquisition documents."

**[1]** The Winklevosses argue that if these terms really are "required" and "typical," then they must be material, and their absence from the Settlement Agreement renders it unenforceable. *See Weddington Prods., Inc.* v. *Flick*, 71 Cal. Rptr. 2d

265, 279-80 (Cal. Ct. App. 1998). But a term may be "material" in one of two ways: It may be a necessary term, without which there can be no contract; or, it may be an important term that affects the value of the bargain. Obviously, omission of the former would render the contract a nullity. *See Citizens Utils. Co.* v. *Wheeler*, 319 P.2d 763, 769-70 (Cal. Dist. Ct. App. 1958) (arms-length acquisition of a private company's shares couldn't proceed because price was omitted from the contract). But a contract that omits terms of the latter type is enforceable under California law, so long as the terms it does include are sufficiently definite for a court to determine whether a breach has occurred, order specific performance or award damages. *See Elite Show Servs., Inc.* v. *Staffpro, Inc.*, 14 Cal. Rptr. 3d 184, 188 (Cal. Ct. App. 2004); 1 B.E. Witkin, *Summary of California Law, Contracts* § 137 (10th ed. 2005) [hereinafter *Witkin on Contracts*]; *cf. Terry* v. *Conlan*, 33 Cal. Rptr. 3d 603, 612-13 (Cal. Ct. App. 2005). This is not a very demanding test, and the Settlement Agreement easily passes it: The parties agreed that Facebook would swallow up ConnectU, the Winklevosses would get cash and a small piece of Facebook, and both sides would stop fighting and get on with their lives.

**[2]** The Settlement Agreement even specifies how to fill in the "material" terms that the Winklevosses claim are missing from the deal:

> *Facebook will determine* the form & documentation of the acquisition of ConnectU's shares [ ] consistent with a stock and cash for stock acquisition. (emphasis added).

California allows parties to delegate choices over terms, so long as the delegation is constrained by the rest of the contract and subject to the implied covenant of good faith and fair dealing. *See Cal. Lettuce Growers, Inc.* v. *Union Sugar Co.*, 289 P.2d 785, 791 (Cal. 1955); *see also* 1 *Witkin on Contracts* § 139. Delegation isn't necessary for a contract like the Settle-

ment Agreement to be enforceable, as the court may fill in missing terms by reference to the rest of the contract, extrinsic evidence and industry practice. *See* 1 *Witkin on Contracts* § 139; *Sterling* v. *Taylor*, 152 P.3d 420, 428-29 (Cal. 2007). But the clause quoted above leaves no doubt that the Winklevosses and Facebook meant to bind themselves and each other, even though everyone understood that some material aspects of the deal would be papered later.

**[3]** The Winklevosses' contractual delegation is valid because the Settlement Agreement obligates Facebook to draw up documents "consistent with a stock and cash for stock acquisition." And, if Facebook should draft terms that are unfair or oppressive, or that deprive the Winklevosses of the benefit of their bargain, the district court could reject them as a breach of the implied covenant of good faith and fair dealing. *See* 1 *Witkin on Contracts* § 798. The district court got it exactly right when it found the Settlement Agreement enforceable but refused to add the stack of documents drafted by Facebook's deal lawyers.

**C.** After signing the Settlement Agreement, Facebook notified the Winklevosses that an internal valuation prepared to comply with Section 409A of the tax code put the value of its common stock at $8.88 per share. The Winklevosses argue that Facebook misled them into believing its shares were worth four times as much. Had they known about this valuation during the mediation, they claim, they would never have signed the Settlement Agreement. The Winklevosses charge Facebook with violating Rule 10b-5, and they seek rescission of the Settlement Agreement under Section 29(b) of the Securities Exchange Act of 1934 (the Exchange Act).

**[4]** Rule 10b-5 prohibits fraud, whether by commission or omission, "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. We assume, without deciding, that a party negotiating an exchange of shares to settle a lawsuit could violate Rule 10b-5 by misstating or hiding

information that would materially change the other side's evaluation of the settlement. *Cf. Green* v. *Ancora-Citronelle Corp.*, 577 F.2d 1380, 1382-83 (9th Cir. 1978); *Foster* v. *Fin. Tech., Inc.*, 517 F.2d 1068, 1071-72 (9th Cir. 1975).

**[5]** Section 29(b) renders voidable "[e]very contract made in violation of any provision of [the securities laws] or of any rule or regulation thereunder, and every contract . . . the performance of which involves [such a] violation." 15 U.S.C. § 78cc(b); *see Mills* v. *Elec. Auto-Lite Co.*, 396 U.S. 375, 387-88 (1970). If Facebook violated Rule 10b-5, the Winklevosses would be entitled to rescission of the Settlement Agreement. *See Mills*, 396 U.S. at 387-88; *Royal Air Props., Inc.* v. *Smith*, 312 F.2d 210, 213 (9th Cir. 1962).

**[6]** The Winklevosses are sophisticated parties who were locked in a contentious struggle over ownership rights in one of the world's fastest-growing companies. They engaged in discovery, which gave them access to a good deal of information about their opponents. They brought half-a-dozen lawyers to the mediation. Howard Winklevoss—father of Cameron and Tyler, former accounting professor at Wharton School of Business and an expert in valuation—also participated. A party seeking to rescind a settlement agreement by claiming a Rule 10b-5 violation under these circumstances faces a steep uphill battle. *See Petro-Ventures, Inc.* v. *Takessian*, 967 F.2d 1337, 1341-42 (9th Cir. 1992); *see also Harsco Corp.* v. *Segui*, 91 F.3d 337, 343-44 (2d Cir. 1996); *Locafrance U.S. Corp.* v. *Intermodal Sys. Leasing, Inc.*, 558 F.2d 1113, 1115 (2d Cir. 1977); *cf. Mergens* v. *Dreyfoos*, 166 F.3d 1114, 1117-18 (11th Cir. 1999) (applying Florida law).

In *Petro-Ventures*, we distinguished between buyers of securities in the context of "an exclusively business relationship," 967 F.2d at 1341, and those "acting in the adversarial setting that is characteristic of litigation," *id.* at 1342. When adversaries "in a roughly equivalent bargaining position and with ready access to counsel" sign an agreement to "estab-

lish[ ] a general peace," we enforce the clear terms of the agreement. *Id.* (citing *Locafrance*, 558 F.2d at 1115). Parties involved in litigation know that they are locked in combat with an adversary and thus have every reason to be skeptical of each other's claims and representations. *See Mergens*, 166 F.3d at 1118; *cf. Goodman* v. *Epstein*, 582 F.2d 388, 403-04 (7th Cir. 1978) (holding that parties signing a release of claims have a "duty of inquiry"); *Moseman* v. *Van Leer*, 263 F.3d 129, 133-34 & n.3 (4th Cir. 2001) (same). They can use discovery to ferret out a great deal of information before even commencing settlement negotiations. They can further protect themselves by requiring that the adverse party supply the needed information, or provide specific representations and warranties as a condition of signing the settlement agreement. *See Harsco*, 91 F.3d at 344. Such parties stand on a very different footing from those who enter into an investment relationship in the open market, where it's reasonable to presume candor and fair dealing, and access to inside information is often limited. There are also very important policies that favor giving effect to agreements that put an end to the expensive and disruptive process of litigation. *See, e.g.*, *Franklin* v. *Kaypro Corp.*, 884 F.2d 1222, 1229 (9th Cir. 1989) ("[I]t hardly seems necessary to point out that there is an overriding public interest in settling and quieting litigation."). We analyze the Winklevosses' securities claims in light of these inhospitable principles.

*Release of claims.* The Settlement Agreement grants "all parties" "mutual releases as broad as possible"; the Winklevosses "represent and warrant" that "[t]hey have no further right to assert against Facebook" and "no further claims against Facebook & its related parties." The Winklevosses maintain that they didn't discover the facts giving rise to their Rule 10b-5 claims until after they signed these releases. They argue that the releases don't foreclose their challenge to the Settlement Agreement because Section 29(a) of the Exchange Act precludes a mutual release of unknown securities fraud claims arising out of negotiations to settle a pending lawsuit.

*See* 15 U.S.C. § 78cc(a) (voiding "[a]ny condition, stipulation, or provision binding any person to waive compliance with" the securities laws).

[7] *Petro-Ventures* dealt with just such a settlement agreement. 967 F.2d at 1338-39. We held that parties possessing roughly equivalent bargaining strength could release *all* claims arising out of the transaction that gave rise to the litigation, even though they hadn't yet discovered some of the securities claims when they signed the settlement. *Id.* at 1342. Such a release is valid if it "is unambiguous in conveying the intent of the parties to release all unknown claims." *Id.* The Settlement Agreement the parties negotiated granted "releases as broad as possible." As sophisticated litigants, the Winklevosses or their counsel should have been familiar with *Petro-Ventures* and understood that the broadest possible release includes both known and unknown securities claims. An agreement meant to end a dispute between sophisticated parties cannot reasonably be interpreted as leaving open the door to litigation about the settlement negotiation process. *See Petro-Ventures*, 967 F.2d at 1342 (discussing the parties' "intent to end their various disputes . . . once and for all" (ellipses in original)). A release in such an agreement would be useless to end litigation if it couldn't include claims arising from the settlement negotiations. *Cf. Sander* v. *Weyerhaeuser*, 966 F.2d 501, 503 (9th Cir. 1992).

[8] The Winklevosses point out that Facebook's alleged securities law violations took place in connection with the settlement itself, whereas the unknown securities claim in *Petro-Ventures* arose out of facts that occurred prior to the settlement. This is a distinction without a difference: Both here and in *Petro-Ventures* the parties gave up securities law claims they didn't know they had. If the release is effective in the one case, there's no principled reason it shouldn't be effective in the other. The district court correctly concluded that the Settlement Agreement meant to release claims arising out of

the settlement negotiations, and that the release was valid under section 29(a).

*Securities fraud claims*. In any event, the Winklevosses' securities fraud claims fail on the merits. The Winklevosses make two related claims: that Facebook led them to believe during the settlement negotiations that its shares were worth $35.90, even though Facebook knew that its shares were, in fact, worth only $8.88; and that Facebook failed to disclose material information, namely the $8.88 tax valuation, during the negotiations.

In support of these claims, the Winklevosses proffered evidence of what was said and not said during the mediation. The district court excluded this evidence under its Alternative Dispute Resolution (ADR) local rule on "confidential information," which it read to create a "privilege" for "evidence regarding the details of the parties' negotiations in their mediation." A local rule, like any court order, can impose a duty of confidentiality as to any aspect of litigation, including mediation. *See* N.D. Cal. ADR L.R. 6-12(a); *see also* 28 U.S.C. § 652(d). But privileges are created by federal common law. *See* Fed. R. Evid. 501. It's doubtful that a district court can augment the list of privileges by local rule. *Cf. In re Grand Jury Subpoena Dated Dec. 17, 1996*, 148 F.3d 487, 491-93 (5th Cir. 1998) (examining whether a federal statute created an evidentiary privilege). In any event, the parties used a private mediator rather than a court-appointed one. *See* N.D. Cal. ADR L.R. 3-4(b) ("A private ADR procedure may be substituted for a Court program if the parties so stipulate and the assigned Judge approves."). Their mediation was thus "not subject to the . . . ADR Local Rules," including Local Rule 6-11. *Id.*

**[9]** Nevertheless, the district court was right to exclude the proffered evidence. The Confidentiality Agreement, which everyone signed before commencing the mediation, provides that:

> All statements made during the course of the mediation or in mediator follow-up thereafter at any time prior to complete settlement of this matter are privileged settlement discussions . . . and are non-discoverable and inadmissible for any purpose including in any legal proceeding. . . . *No aspect of the mediation shall be relied upon or introduced as evidence in any arbitral, judicial, or other proceeding.* (emphasis added).

This agreement precludes the Winklevosses from introducing in support of their securities claims any evidence of what Facebook said, or did not say, during the mediation. *See Johnson* v. *Am. Online, Inc.*, 280 F. Supp. 2d 1018, 1027 (N.D. Cal. 2003) (enforcing a similar agreement). The Winklevosses can't show that Facebook misled them about the value of its shares or that disclosure of the tax valuation would have significantly altered the mix of information available to them during settlement negotiations. Without such evidence, their securities claims must fail. *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005); *see also McCormick* v. *Fund Am. Cos.*, 26 F.3d 869, 876 (9th Cir. 1994).

The Winklevosses argue that if the Confidentiality Agreement is construed to defeat their Rule 10b-5 claims, it is void under section 29(a) of the Exchange Act as an invalid waiver. But section 29(a) "applie[s] only to express waivers of non-compliance," *Levy* v. *Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14, 18 (2d Cir. 2001), with the "substantive obligations imposed by the Exchange Act," *Shearson/Am. Express, Inc.* v. *McMahon*, 482 U.S. 220, 228 (1987). The Confidentiality Agreement merely precludes both parties from introducing evidence of a certain kind. Although this frustrates the securities claims the Winklevosses chose to bring, the Confidentiality Agreement doesn't purport to limit or waive their right to sue, Facebook's obligation not to violate Rule 10b-5 or Facebook's liability under any provision of the securities laws. *See McMahon*, 482 U.S. at 230.

**[10]** Even if we were to construe the Confidentiality Agreement as a waiver of the Winklevosses' 10b-5 claims, it wouldn't violate section 29(a). *Petro-Ventures* expressly considered a section 29(a) argument in the context of a global settlement agreement between sophisticated parties engaged in litigation. 967 F.2d at 1341-43. The court distinguished an earlier case, *Burgess* v. *Premier Corp.*, 727 F.2d 826 (9th Cir. 1984), which had applied section 29(a) to preclude the waiver of unknown claims by plaintiffs who were "not acting in the adversarial setting that is characteristic of litigation." *Petro-Ventures*, 967 F.2d at 1342. *Petro-Ventures* held that "a totally different situation occurs where a plaintiff has affirmatively acted to release another party from any possible liability in connection with a transaction in securities." *Id.* In such situations, the parties are "not so concerned with protecting their rights as investors as they [are] with establishing a general peace." *Id.* We are bound by *Petro-Ventures* to conclude that the Confidentiality Agreement did not violate section 29(a). *Cf. Locafrance*, 558 F.2d at 1115.

* * *

The Winklevosses are not the first parties bested by a competitor who then seek to gain through litigation what they were unable to achieve in the marketplace. And the courts might have obliged, had the Winklevosses not settled their dispute and signed a release of all claims against Facebook. With the help of a team of lawyers and a financial advisor, they made a deal that appears quite favorable in light of recent market activity. *See* Geoffrey A. Fowler & Liz Rappaport, *Facebook Deal Raises $1 Billion*, Wall St. J., Jan. 22, 2011, at B4 (reporting that investors valued Facebook at $50 billion —3.33 times the value the Winklevosses claim they thought Facebook's shares were worth at the mediation). For whatever reason, they now want to back out. Like the district court, we see no basis for allowing them to do so. At some point, litigation must come to an end. That point has now been reached.

**AFFIRMED.**